**Kevan J. CORTRIGHT, Cortright Realtors, and Trapp & Associates, Appellees,**

v.

**Paul D.M. PETTIT and Mary K. Pettit, Appellants.**

No. 88–1868.

Court of Appeals of Iowa.

June 26, 1990.

William H. Gilliam, Waterloo, for appellants.

Bruce B. Zager, Waterloo, for appellees.

Heard by DONIELSON, P.J., and SCHLEGEL and HABHAB, JJ.

HABHAB, Judge.

Appellants, Paul D.M. Pettit and Mary K. Pettit, appeal the decision of the district court awarding appellee realtors a brokerage sales commission on the sale of appellants' home. We affirm.

Appellants were residents of Waterloo, Iowa. In 1985, Paul, a medical doctor, obtained employment with the Mayo Clinic in Rochester, Minnesota. It was understood that Paul would work in Rochester until the Mayo Clinic branch in Jacksonville, Florida commenced operation, at which time he would transfer to that branch.

On July 29, 1985, appellants entered into a uniform listing contract with appellee Kevan J. Cortright for the sale of their home. When the property did not sell, the parties, on January 20, 1986, executed a six-month extension of the original listing. Mary signed the extension agreement for Paul. Paul was aware of Mary's actions and approved them.

In July of 1986, Sharon Wedeking, an agent of appellee realtor Trapp & Associates, was contacted by Margaret Jenkins concerning the purchase of a home in the Waterloo–Cedar Falls area. Margaret revealed that she and her husband, Charles W. Jenkins, would be moving to the area for Charles was to be the new general

manager at Doerfer Engineering Company in Cedar Falls. Wedeking showed Margaret ten to twelve homes in mid-July of 1986, including the Pettits' home. After showing the Pettit property to Charles, the Jenkins, on August 1, 1986, executed a uniform offer and acceptance contract for the Pettit property.

After the Jenkins returned to Florida, Charles was informed that his transfer to Cedar Falls might not transpire. Thereafter, the Jenkins attempted to retract their offer. Because of this turn of events, on August 21, 1986, a new uniform listing contract was executed by Mary. She again signed her and Paul's names to the agreement. On August 26, 1986, the Pettits brought suit against the Jenkins for specific performance of the August 1st contract.

In October of 1986, Charles learned that he would be transferring to Cedar Falls. The Jenkins decided at that point to carry out their purchase of the Pettit property. A new offer and acceptance contract was drafted by Pettits' counsel which, unlike the August 1st contract, omitted the provision for payment of a real estate commission.

On November 14, 1986, Pettits' counsel informed appellee Cortright by letter that the Pettits were revoking the August 21st uniform listing contract. On November 17, 1986, the Pettits transferred by warranty deed the Pettit property to the Jenkins. No commission was paid to appellees. As a result, appellees brought suit against Pettits for payment of the commission on the sale. The district court awarded appellees judgment against Pettits, and Pettits have appealed.

### I.

Paul Pettit argues initially that the district court lacked jurisdiction over him. A two-prong test is employed in resolving nonresident jurisdictional questions. *Robert Half of Iowa, Inc. v. Citizens Bank*, 453 N.W.2d 236, 237 (Iowa App.1990); *Egli v. Egli*, 447 N.W.2d 409, 411 (Iowa App. 1989); *Martin v. Ju–Li Corp.*, 332 N.W.2d 871, 874 (Iowa 1983); *Larsen v. Scholl*, 296 N.W.2d 785, 787 (Iowa 1980). First, we

inquire as to whether a statute or rule authorizes assumption of jurisdiction over defendant. *Citizens Bank*, 453 N.W.2d at 237; *Egli*, 447 N.W.2d at 411. Second, if the initial criteria is met, we determine whether this exercise of personal jurisdiction offends due process. *Citizens Bank*, 453 N.W.2d at 237; *Egli*, 447 N.W.2d at 411.

Iowa Code section 617.3, Iowa's long-arm statute, authorizes personal jurisdiction over a nonresident defendant who has entered into a contract which is "to be performed in whole or in part by either party in Iowa...." Here, the original listing was signed by both Pettits. On the subsequently-executed extensions, however, Mary signed both Pettits' names. Paul now asserts that since he was not a signatory to the aforementioned extensions, he has not entered into a contract to be performed in Iowa which would form the basis for an Iowa District Court to acquire personal jurisdiction over him. We conclude that Mary was acting as Paul's agent when she signed his name to the extensions. The Iowa Supreme Court has defined an agency relationship to be:

> a fiduciary relationship resulting from the manifestation of consent by one person, the "principal," that another, the "agent," shall act on the former's behalf and subject to the former's control and from consent by the latter to so act.

*Farmers Grain Co. v. Irving*, 401 N.W.2d 596, 601 (Iowa App.1986).

Paul testified that he expressly approved Mary's execution of the January 20th extension agreement. While he denied any approval of the August 21st extension, it is readily apparent to us that Mary had implied authority to execute that extension agreement. Even were we to conclude otherwise, Paul's inaction after learning of the August 21st extension is compelling evidence that he ratified the extension. Paul only sought to revoke the listing agreement after the Jenkins, upon learning that they would in fact be moving to Cedar Falls, decided to go through with the purchase of the Pettits' house.

■ The second part of our analysis requires a determination of whether this exercise of in personam jurisdiction over the nonresident defendant satisfies the "traditional notions of fair play and substantial justice." *See Kulko v. California Superior Court*, 436 U.S. 84, 92, 98 S.Ct. 1690, 1696–97, 56 L.Ed.2d 132, 141 (1978). In undertaking such an analysis, we look to see if the nonresident defendant has sufficient minimum contacts with the forum state. *See id.* at 92, 98 S.Ct. at 1696, 56 L.Ed.2d at 141. Additionally, we look to "some act by which the defendant purposefully avails ... himself of the privilege of conducting activities within the forum state." *Id.* at 94, 98 S.Ct. at 1698, 56 L.Ed.2d at 142 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283, 1298 (1958)).

■ We apply the aforementioned standard in light of five factors, the first three being the most important:

(1) the quality of the contacts;

(2) the nature and quality. of the contacts;

(3) the source and connection of the cause of action with those contacts;

(4) the interest of the forum state; and

(5) the convenience of the parties.

*Egli*, 447 N.W.2d at 411 (quoting *Larsen*, 296 N.W.2d at 788).

Paul was a resident of Iowa until April of 1986. Even after he left the State of Iowa to begin employment with the Mayo Clinic, he still owned real estate in Iowa. After he left Iowa, his wife continued to reside in Waterloo and executed contracts as Paul's agent for the purpose of selling their home in Waterloo. In addition, in order to enforce the August 1st real estate contract with the Jenkins, the Pettits filed suit in Iowa District Court.

When we evaluate the jurisdiction sought over Paul in light of the five factors set forth above, we have little trouble ascertaining Paul has sufficient minimum contacts with Iowa, thereby conferring to the Iowa District Court in personam jurisdiction over Paul.

## II.

■ The Pettits next argue the trial court erred in granting judgment for appellees where the broker failed to comply with an Iowa administrative rule. The Pettits direct our attention to section 1.18, 193E Iowa Administrative Code, which provides:

To enforce a protective clause beyond the expiration of an exclusive listing contract, there must be a provision for the protective clause in the listing contract which establishes a definite protection period, and the broker must furnish to the owner prior to the expiration of the listing the names and addresses of persons to whom the property was presented during the active term of the listing and for whom protection is sought.

We find this administrative rule inapplicable to the case sub judice for the terms of the August 1st contract for the sale of the Pettit home explicitly provide for a commission. Such a provision is an acknowledgment that the realtor has met the requirements of the listing contract and has earned a commission.

We have no quarrel with appellants' analysis of section 1.18. That rule is clear that if a real estate broker intends to enforce a protective clause beyond the expiration of an exclusive listing contract, there must (1) be a provision for the protective clause in the listing contract which (2) establishes a definite protection period, and (3) the broker must furnish to the owner prior to the expiration of the listing the names and addresses of persons to whom the property was presented during the active term of the listing and for whom protection is sought. But here the appellees are not attempting to enforce the protective clause under the listing contract. The Pettits, under the August 1st contract, agreed to pay a sales commission. It is clear to us that it was the intent of all interested parties to pay a real estate commission.

## III.

■ Finally, the Pettits claim that the sale of their home under the November sale contract precludes appellees from ob-

taining a commission. The gist of Pettits' argument is that since the sale occurred after their revocation of the August 21st listing agreement, appellees have no basis for claiming a commission on the sale. We reject appellants' arguments on this point.

We conclude appellees satisfied the conditions of the listing agreement entitling them to their commission upon the signing of the August 1st contract. The efforts of appellees resulted in ready, willing, and able purchasers, the Jenkins, being located. *See McCulloch Investment Co. v. Spencer*, 246 Iowa 433, 437, 67 N.W.2d 924, 926 (1955). Through no fault of appellees, the Jenkins attempted to breach the above-mentioned contract.

When the Jenkins learned their transfer to the Waterloo area would in fact take place, they quickly sought to settle the Pettits' suit against them for specific performance and conclude their purchase of the Pettit home. Instead of continuing with the August 1st contract, however, the Pettits and Jenkins entered into a new contract for the sale of the Pettit home. This new contract, virtually identical to the August 1st contract with the exception of a commission provision, was executed immediately after the Pettits revoked the August 21st listing agreement.

■ Even were we to conclude that appellees had not earned their commission as of August 1st, the Pettits subsequent actions would not preclude appellees' recovery of their commission. Restatement (Second) of Agency § 454 (1958) provides:

> An agent to whom the principal has made a revocable offer of compensation if he accomplishes a specified result is entitled to the promised amount if the principal, in order to avoid payment of it, revokes the offer and thereafter the result is accomplished as a result of the agent's prior efforts.

Comment a to this section provides in pertinent part:

> If, however, the agreement is such that the principal can deprive the agent of all compensation by improperly terminating the employment and if the agent is on the verge of success and, but for the

aleatory element of the transaction, he would be entitled to practically full compensation for his services, the rule stated in this Section is necessary in order to prevent sharp dealing. Under such circumstances, if the principal revokes the offer to the agent, intending thereby to take the benefits of the agent's services without paying for them, he acts in bad faith; that if he thus acts, specific reparation is afforded to the agent by disregarding the revocation and determining his right to the promised compensation as though no revocation had been made.

*Id.* at § 454 comment a.

Additionally, comment b as part of this *Restatement* section provides as follows:

> The typical situation for the application of the rule is that in which a broker or other intermediary has so nearly succeeded in procuring a customer or completing a transaction that the principal believes that he can perform the rest of the transaction without further assistance or expense. If, in this case, the principal terminates the agency, either to save for himself the broker's commission or to let the buyer or another agent have it, the broker is entitled to the agreed compensation.

*Id.* at § 454 comment b.

We note further that liability may attach under this *Restatement* section if the termination is in bad faith. The test of bad faith termination "is whether the vendors terminated the listing agreement for the purpose of escaping payment of the broker's commission." *Snyder v. Schram*, 282 Or. 273, 577 P.2d 935, 936 (1978). Factors to be considered include:

> (1) the progress of negotiations between the broker and the customer and the prospect for a sale to the customer, (2) the length of time between the revocation of the listing and the eventual sale, and (3) knowledge by the principal of the terms of the prospective sale and identity of the customer.

*Id.* 577 P.2d at 936. The transparency of the Pettits' actions surrounding the execu-

tion of the November sales contract are palpable. We agree with the trial court that the appellees are entitled to their commission.

AFFIRMED.