Monte Leen, individually and d/b/a Leen & Associates,
Plaintiff-Appellant,

v.

The Butter Company, a Wisconsin Corporation,
Defendant-Respondent.†

Court of Appeals

*No. 92–1343. Submitted on briefs April 6, 1993.—Decided
May 11, 1993.*

(Also reported in 501 N.W.2d 847.)

†Petition to review denied.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Michael S. Polsky* and *Steven R. Schnoll* of *Trebon & Polsky*, of Milwaukee.

On behalf of the defendant-respondent, the cause was submitted on the briefs of *Fred A. Erchul* and *Willard G. Neary* of *Lichtsinn & Haensel, S.C.*, of Milwaukee.

Before Wedemeyer, P.J., Sullivan and Fine, JJ.

FINE, J.   Monte Leen and his company, Monte Leen & Associates, brought this action against The Butter Company alleging that Butter had breached an agreement making Leen the exclusive agent for Butter in the purchase of bathroom cabinets from Chi Sen Timber Industrial Company, a manufacturer in Taiwan.[1] Leen seeks commissions he claims he is owed on sales made after Butter terminated the agency relationship. The matter was tried to a jury but the trial

---

[1] The complaint spells the company's name as Chi *San* Timber. Other documents in the file spell it as Chi *Sen* Timber. We adopt the latter spelling.

court granted Butter's motion for a directed verdict at the close of the evidence. Leen appeals. We reverse.

An agent is entitled to commissions when he or she "procures an order from a ready, willing, and able purchaser, and this order is received by the company" even though actual delivery and payment may be made after termination of the agency, *Zweck v. D P Way Corp.*, 70 Wis. 2d 426, 430–431, 234 N.W.2d 921, 924 (1975), and irrespective of whether or not the agency contract provides for payment of commissions after termination, *Kreinz v. NDII Securities Corp.*, 138 Wis. 2d 204, 211, 406 N.W.2d 164, 166–167 (Ct. App. 1987). Indeed, unless the agency agreement provides otherwise, " 'final consummation of the sale' is not required." *Fryer v. Conant*, 159 Wis. 2d 739, 744, 465 N.W.2d 517, 519 (Ct. App. 1990) (real estate listing contract) (citation omitted). Thus, in *Fryer*, a real estate agent was entitled to a commission for the sale of commercial realty because there was the requisite "meeting of the minds" between his principal and the purchaser produced by the agent within the time limit imposed by the brokerage contract even though the actual sale did not take place until after that limit expired. *Id.*, 159 Wis. 2d at 741–746, 465 N.W.2d at 518–520.

*Fryer* is consistent with the generally-recognized rule that when the agent accomplishes the result for which he or she was retained a principal cannot avoid paying commissions by merely terminating the agency:

> An agent to whom the principal has made a revocable offer of compensation if he accomplishes a specified result is entitled to the promised amount if the principal, in order to avoid payment of it,

153

revokes the offer and thereafter the result is accomplished as the result of the agent's prior efforts.

RESTATEMENT (SECOND) OF AGENCY § 454 (1957). Under this rule, an agent who seeks commissions for sales that are made after termination of the agency must prove two elements: (1) that the agency was terminated by the principal to avoid paying the commissions; and, (2) that the agent was the "procuring cause" of the sales. *See Potomac Chemical Co. v. Chapman*, 146 F.2d 664, 665 (D.C. Cir. 1944). As explained by the RESTATEMENT:

> If ... the [agency] agreement is such that the principal can deprive the agent of all compensation by properly terminating the employment and if the agent is on the verge of success and, but for the aleatory element in the transaction, he would be entitled to practically full compensation for his services, the rule stated in this Section [454] is necessary in order to prevent sharp dealing. Under such circumstances, if the principal revokes his offer to the agent, intending thereby to take the benefits of the agent's services without paying for them, he acts in bad faith; and if he thus acts, specific reparation is afforded the agent by disregarding the revocation and determining his right to the promised compensation as though no revocation had been made.

RESTATEMENT (SECOND) OF AGENCY § 454 comment a; *see also Cortright v. Pettit*, 461 N.W.2d 202, 206 (Ia. Ct. App. 1990) (adopting RESTATEMENT); *Gaylen Machinery Corp. v. Pitman-Moore Co.*, 273 F.2d 340, 343 (2d Cir. 1959) (applying New York law; recognizing RESTATEMENT); *Erk v. Glenn L. Martin Co.*, 116 F.2d 865, 869 (4th Cir. 1941) (applying Maryland law; recognizing substantially similar rule in FIRST RESTATEMENT). This

154

general rule does not apply, however, when the agency agreement specifically limits the recovery of commissions following termination. *Willis v. Champlain Cable Corp.*, 748 P.2d 621, 625–628 (Wash. 1988) (reviewing authorities). It is against this background that we analyze the trial court's grant of Butter's motion for a directed verdict.

■

"A motion for a directed verdict should be granted only where the evidence is so clear and convincing that a reasonable and impartial jury properly instructed could reach but one conclusion." *Liebe v. City Finance Co.*, 98 Wis. 2d 10, 18–19, 295 N.W.2d 16, 20 (Ct. App. 1980). In making that determination, the evidence must be "viewed most favorably to the party against whom the verdict is sought to be directed." *Village of Menomonee Falls v. Michelson*, 104 Wis. 2d 137, 154, 311 N.W.2d 658, 666 (Ct. App. 1981). "Although we apply the same standard on appeal, we must also give substantial deference to the trial court's better ability to assess the evidence." *James v. Heintz*, 165 Wis. 2d 572, 577, 478 N.W.2d 31, 33 (Ct. App. 1991) (motion to dismiss at the end of the plaintiff's case). Thus, we should not reverse a trial court's grant of a motion for a directed verdict unless the record reveals that the trial court was " 'clearly wrong.' " *Ibid.* (citation omitted).

■

As noted, in resolving the issue of whether a properly instructed jury could have reasonably found for Leen we must look at the evidence in the light most favorable to his position. Accordingly, we examine his testimony, which the jury could have reasonably believed, as well as supporting documentation proffered by him.

155

Leen runs an import-export company and does regular business in Taiwan. Essentially, he acts as a middleman for United States-based sellers of what he termed "home center products," such as bathroom fixtures, vanities, and medicine cabinets. He told the jury that his clients in the United States use him because he "would normally be able to negotiate a better price than they would do themselves" because he was able, by virtue of his experience and contacts, to "deal directly with the factories" in Taiwan. When a former co-worker at Leen's earlier employment went with The Butter Company, which sells the type of products in which Leen deals, Leen saw an opportunity for Butter to purchase cabinets from Chi Sen Timber.

Although Leen generally does not identify his sources to clients because, as he testified, there is "a problem in the Orient that they will go around you and sell on a direct basis if they happen to find out who the customers are early on," he broke that practice here. Hoping to impress Butter with the quality of cabinets produced by Chi Sen Timber, he suggested to Butter that Butter employees visit the Chi Sen Timber factory when they were in Taiwan. They did. Shortly thereafter, on April 3, 1988, Leen sent a facsimile transmission to Chi Sen Timber seeking additional information on the items in which Butter was interested. The transmission also asked Chi Sen Timber to "protect me as much as possible in this situation." Leen explained to Chi Sen Timber that he had been "working with Butter for over 5 months to try to get their business on these items." Subsequently, on April 18, 1988, Butter confirmed to Chi Sen Timber Leen's status as Butter's agent *via* the following facsimile transmission:

Please be advised that Leen and Associates has been selected as our agent of choice for the vanity/medicine cabinet product category. I would appreciate it if you could work as closely as possible with Monte [Leen] in providing to me the information that will make our program a success.

The documentary evidence introduced by Leen supports Leen's claim in his April 3 transmission to Chi Sen Timber that he had been working hard on the Chi Sen Timber/Butter deal. Ultimately, Leen got quotes from Chi Sen Timber for items in which Butter was interested, and, pursuant to his agreement with Butter, added a three-percent markup as his commission.[2] In May of 1988, Leen went to Taiwan to, as he testified, wrap up "the loose ends that had not yet been finalized" on Butter's purchases from Chi Sen Timber.

On June 7, 1988, Butter responded to a facsimile transmission from Chi Sen Timber of that date, and agreed to "honor [Chi Sen Timber's] request that we buy your product on a direct basis and not utilize any agent." Approximately two weeks later, Butter called Leen to tell him that his agency in connection with the purchases from Chi Sen Timber was terminated. Although no purchases had yet been made, Leen testified that by June 7 all of the essential work on the deal was complete:

> We had done basically everything except for finalizing the film [for the catalogue pictures] and the vanity samples which [Butter] identified were being sent right immediately, and the only additional functions that would have been left to do was to actually get the physical order in hand and clerical

---

[2] The agreement was oral, as Leen testified is customary in the business.

functions as far as placing the order and processing the letter of credit and just the general work that the staff that works for me would have done.

Leen's former co-worker, the Butter employee working with Leen on the Chi Sen Timber deal, testified that Butter paid the prices that Chi Sen Timber had quoted to Leen, without the payment of the three-percent mark-up Leen had added as his commission.

In light of this evidence, a reasonable and impartial jury could have decided: 1) that Leen's agency with The Butter Company was terminated by Butter to avoid paying Leen commissions; and 2) that at least some of the sales at issue were, in the words of the RESTATEMENT, the "result of" Leen's efforts prior to his termination.[3] Indeed, looking at the evidence in the light most favorable to Leen, it appears that this case is representative of what the drafters of the RESTATEMENT rule envisioned:

> The typical situation for the application of the rule is that in which a broker or other intermediary has so nearly succeeded in procuring a customer or completing a transaction that the principal believes that he can perform the rest of the transaction without further assistance or expense. If, in this case, the principal terminates the agency, either to save for himself the broker's commission or to let the buyer or another agent have it, the broker is entitled to the agreed compensation.

RESTATEMENT (SECOND) OF AGENCY § 454 comment b. We conclude that the trial court's grant of Butter's motion for a directed verdict was "clearly wrong." Accordingly,

---

[3] Leen submitted a special verdict seeking commissions on sales by Chi Sen Timber to Butter through February, 1992.

the order granting Butter's motion for a directed verdict must be reversed, and the matter remanded for a new trial.[4]

*By the Court.*—Order reversed.

[4] Retrials are costly—to the litigants as well as to an overburdened judicial system. We, again, note that these additional expenses could have been avoided if the trial court had only taken the additional small step of reserving its decision on Butter's motion to dismiss, and let the case go to the jury. *See James v. Heintz*, 165 Wis. 2d 572, 577 n.4, 478 N.W.2d 31, 34 n.4 (Ct. App. 1991).