[No. 17260-1-III.  Division Three.  February 4, 1999.]

BLUE MOUNTAIN MEMORIAL GARDENS, *Respondent*, v. THE DEPARTMENT OF LICENSING, CEMETERY BOARD, *Appellant*.

*Christine O. Gregoire, Attorney General,* and *David M. Hankins,* for appellant.
*Kristian E. Hedine,* for respondent.

SWEENEY, J. — The question here is whether, giving due

deference to the Cemetery Board's knowledge and expertise, the Board erred in concluding that the term "interment vault" as used in prearrangement contracts, included commercial grave liners used by Blue Mountain Memorial Gardens. The Board correctly concluded that grave liners were not vaults. We therefore reverse the decision of the Walla Walla County Superior Court which reversed the Board's suspension of Blue Mountain's certificate of authority.

## FACTS

Bill and Virginia Walsh owned Blue Mountain Memorial Gardens until 1989. The Walshes manufactured both concrete vaults and liners at the cemetery. Between 1962 and 1971, the Walshes entered into "prearrangement contracts" whereby people paid in advance of need for cemetery lots, vaults, and markers. The prearrangement contracts were preprinted with the phrase "interment vault." This referred to the outer container that surrounds the casket in the ground. The term "interment vault" was not defined in the contracts.

Lloyd and Virginia Mahan bought Blue Mountain from the Walshes in 1989. The sales price of the cemetery was reduced to account for the unfunded prearrangement contracts, which predated legislative requirements that funds be set aside for their execution.

The Mahans continued to manufacture concrete vaults and liners on site, and provided vaults to contract decedents until 1991. In 1991, Mr. Mahan stopped manufacturing and began to substitute commercially manufactured grave liners for the Walsh vaults.

Between July 1991 and August 1995, the Mahans provided grave liners instead of burial vaults for as many as 71 decedents who had contracts for burial vaults. Unless the families asked, they were not told about the substitution. No one asked. Mr. Mahan testified that his employees were instructed to explain that a liner was not sealed to

exclude air and water as was a vault, but that the commercial liner was an improvement over the Walsh vault they had contracted for. If they wanted a commercial vault, it cost an additional $300.

Louis Murray filed a complaint against Blue Mountain when he discovered his mother, a Walsh-contract decedent, was buried in a liner. Numerous cemeteries and funeral homes had told him there is a dramatic difference between a vault and a liner.

At the Board disciplinary hearing, experts on both sides gave conflicting evidence on whether the industry distinguishes between vaults and liners and whether such a difference was recognized as an industry standard.

The Board asserts that a vault, unlike a liner, seals out the elements. It comes with a manufacturer's warranty against leaking; liners do not. And this difference has long been recognized as an industry standard. This being so, the Board concluded that the parties to the Walsh contracts intended "interment vault" to mean a sealed compartment. The Mahans knew this was the intended meaning. And Blue Mountain thus knowingly failed to honor the contracts when it supplied the liners.

Blue Mountain contends that the terms were then and are today essentially meaningless. "Vault," "liner," or "grave box" are merely marketing terms. And, even if the Board's definition of a vault were accepted as an industry standard, the old Walsh vault did not meet this standard. A vault, the Mahans contend, must have an inner lining. The Walsh vault did not. According to Mr. Mahan, the chamber of the Walsh vault could seal only if the base were both level and unbroken; it usually was not.

The Board was not persuaded by Blue Mountain's experts and believed the evidence from Ms. Walsh that the Walsh vault seal functioned to keep the burial chamber dry. The Board also found that the cemetery industry differentiates between vaults and liners; that vaults are a superior product, offering significantly greater protection to their contents than do liners; and that, although the technology

has evolved, the product contracted for was, by modern standards, a vault and not a liner.

The Board was persuaded that the parties to the Walsh prearrangement contracts had agreed to the use of vaults; and that at least some, if not all, of the Walsh prearrangement contracts were dishonored when Blue Mountain modified the agreement by substituting grave liners for vaults without the knowledge or consent of the families.

Based on these findings the Board issued an order, pursuant to RCW 68.05.300 and RCW 68.05.105, suspending Blue Mountain's certificate for 24 months, subject to stay if the Mahans paid a $15,000 fine and replaced the offending liners with vaults for those families who wanted vaults.

Blue Mountain appealed. The superior court dismissed the action, holding that the record did not support the Board's finding that there was an industry standard for the years 1962 to 1971. The court therefore found no basis for the Board's conclusion the contracts had been breached. The Board appeals.

DISCUSSION

■ *Standard of Review.* Review of administrative proceedings is governed by RCW 34.05. We must uphold the agency's findings of fact if they are supported by substantial evidence in the record that was before the board. RCW 34.05.570(3)(e); RCW 34.05.574(1); *Tapper v. Employment Sec. Dep't,* 122 Wn.2d 397, 402, 858 P.2d 494 (1993). Evidence is substantial if it is sufficient to persuade a fair-minded person of the truth of the proposition. *Heinmiller v. Department of Health,* 127 Wn.2d 595, 607, 903 P.2d 433, 909 P.2d 1294 (1995), *cert. denied,* 518 U.S. 1006 (1996).

■ ■ Review of the Board's conclusions of law is de novo. RCW 34.05.570(3)(d). The standard is "error of law." We review the agency's action, not the superior court's. *Waste Management of Seattle, Inc. v. Utilities & Transp. Comm'n,* 123 Wn.2d 621, 632, 869 P.2d 1034 (1994). The

reviewing court must give due deference to the agency's knowledge and expertise. *Clausing v. State,* 90 Wn. App. 863, 871, 955 P.2d 394, *review denied,* 136 Wn.2d 1020 (1998). However, although the Board's interpretation of the law it administers is accorded substantial weight, the error of law standard permits this court to substitute its interpretation of the law for that of the Board. *Haley v. Medical Disciplinary Bd.,* 117 Wn.2d 720, 728, 818 P.2d 1062 (1991).

We may grant relief if the Board erroneously interpreted or applied the law, if the decision is not supported by substantial evidence, or if it is inconsistent with the agency's own rules. *Clausing,* 90 Wn. App. at 870.

■ *Parties' Intended Meaning of Vault.* Words are given their "general and ordinary accepted meaning and connotation" unless otherwise defined by the parties or by the dictates of the context. *Keeton v. Department of Soc. & Health Servs.,* 34 Wn. App. 353, 360-61, 661 P.2d 982, *review denied,* 99 Wn.2d 1022 (1983); *Underwriters Subscribing to Lloyd's Ins. Cert. No. 80520 v. Magi, Inc.,* 790 F. Supp. 1043, 1050 (E.D. Wash. 1991). However, a term of art in a given field is given its technical meaning when used in an agreement within that field. RESTATEMENT (SECOND) OF CONTRACTS § 202 (1981).

■ Considering the Board's expertise, there is substantial evidence that the word "vault" is a term of art in the burial industry and that industry standard requires that a vault exclude outside elements. A liner does not exclude outside elements.

Blue Mountain points to the absence of a definition for the word "vault," either in the statutes or the contract. The statute lumps together vaults and liners as "outer burial containers" in the only statutory reference. RCW 68.04.165. The disputed contracts leave the word "vault" undefined. The term "interment vault," Blue Mountain contends, was essentially meaningless when the contracts were created. And there is complete disagreement between industry experts as to the definition of "vault," even today.

The Board demonstrated that the industry differentiates between a vault and a liner, and that this difference existed at the time the prearrangement contracts were made. Experts from both sides explained the difference.

Since 1990, the National Concrete Burial Vault Association has defined liner and vault. A liner is a burial receptacle placed in the ground in a cemetery, designed and built to support the weight of the earth above it and to prevent the grave from collapsing. A vault performs all the functions of the concrete grave liner and, in addition, is lined and sealed. It is designed and constructed to increase the overall tensile strength of the finished unit and to reduce the risk of the intrusion of exterior elements.

The next question is whether this distinction was standard at the time the Walsh contracts were created. Blue Mountain's own expert testified: "[I]f I saw a product that did not offer watertight and airtight features, you're not going to call that a vault." Certified Admin. Hr'g R. at 623.

During the relevant period, the Walshes manufactured two products, one called a vault and one called a liner. The vault was of the "air-seal" or "bottom-seal" variety and received an outer coating of rubber-based paint. Its base was a single slab of concrete. The Walsh liner contained less concrete, was not coated, and its base was in four pieces.

*The Families Were Not Informed.* Mr. Mahan testified his policy was to tell affected families that they were receiving a liner which was not designed to seal instead of a vault which was, that the liner was nevertheless an upgraded product, and that if they desired a vault it would cost them an extra $300. However, two Blue Mountain employees testified that this circular and inconsistent notice of the substitution was not offered unless somebody asked. The only person who did ask was Mr. Murray.

Circumstantial evidence supports the finding that the substitution was made without notice. The paperwork was not altered to substitute the word "liner" for "vault."

However, the notation "old vault" or "old contract" was made on the paperwork when a contract burial took place. The Board could reasonably infer that this alerted the cemetery staff that "vault" in this burial should be read to mean "liner," as distinguished from the usual case in which "vault" meant "vault." It was also customary for newspaper notices issued by the cemetery to designate "vault interment" if the family had bought a vault, but not if they bought a liner. In announcing the prearrangement contract burials, the notice declared "vault interment," even though a liner was used.

Although the record suggests less than rigorous and consistent industry adherence to the standard then or now, the record does contain substantial evidence that the qualitative difference between a vault and a liner was recognized when the Walsh contracts were created.

■ *The Substitution Was Not Equivalent.* There was testimony from industry practitioners that when an item specified in an old contract is not available at the time of death, it is standard practice to substitute a similar item of equal or greater value. Blue Mountain claims the liner it supplied was in every way equivalent to the old Walsh vault. Blue Mountain presented evidence that the Walsh vault was inherently unreliable for creating a sealed environment. But Ms. Walsh presented an eyewitness account of two disinterments of Walsh vaults in which the grave contents emerged dry and in good condition.

Liners are designed with a drainage hole. The liner Blue Mountain buried Mrs. Murray in had two holes. When it was disinterred a few weeks after burial, mud and water were running out and there was significant condensation on the casket. Mr. Mahan admitted that, at the time of the substitutions, he understood that a vault seals, and a liner does not. Certified Admin. Hr'g R. at 457-58. Also, he charged more for a vault than a liner.

If the Walsh vault sealed, a substitute product that did not seal was not comparable. Even without a guaranteed seal, Mr. Mahan's own expert testified that the standard

industry practice was to provide a bottom-of-the-line vault, not a liner, if an old contract specified a nonsealing vault. The record shows that the liner was an inferior product both when the contracts were executed and when the substitutions were made.

*The Board Acted Within Its Authority.* Finally, Blue Mountain's challenge to the Board's statutory authority to impose sanctions is without merit.

The Board may serve charges on a cemetery authority if, in the opinion of the Board, it has violated any statute or rule of the Board. RCW 68.05.320(1)(b). The Board may revoke, suspend, or terminate a certificate of authority or prearrangement sales license if a cemetery authority fails to comply with any provision of RCW 68.05. RCW 68.05.300(1).

Blue Mountain violated RCW 68.05.115, under which it was required to honor all existing prearrangement contracts. Once a violation is established, the Board has authority under RCW 68.05.105, .173, .300(1)-(2) and .320(1)(b) to impose sanctions.

We reverse the superior court's order of dismissal and affirm the action of the Board.

BROWN and KATO, JJ., concur.

Review denied at 138 Wn.2d 1011 (1999).