Donald R. SCRIBNER, Plaintiff–Appellant,

v.

WORLDCOM, INC., a Georgia Corporation, Defendant–Appellee.

No. 99–35239

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 3, 2001

Filed May 8, 2001

Edward J. Anson, Argued, Coeur d'Alene, Idaho, for the plaintiff-appellant.

Jeffrey L. Supinger, Briefed, Witherspoon, Kelley, Davenport & Toole, Spokane, Washington, for the plaintiff-appellant.

Leonard J. Feldman, Argued & Briefed, Heller, Ehrman, White, & McAuliffe, Seattle, Washington, for the defendant-appellee.

Before: DAVID R. THOMPSON, TROTT, and PAEZ, Circuit Judges.

TROTT, Circuit Judge:

In this appeal, we must decide what the words "termination without cause" mean in the context of a stock option contract between an employer and employee. The question is whether the employer, who retains discretion to construe the contract, can define the word "cause" to mean something other than its ordinary meaning without informing the employee that the ordinary meaning is irrelevant. Under the circumstances of this case, we conclude that the answer is no.

The parties are Donald Scribner and WorldCom, Inc., Scribner's former employer. Scribner owned unvested options to purchase shares of WorldCom stock, which were to become immediately exercisable if WorldCom terminated him "without cause." WorldCom eventually terminated Scribner, not because of shortcomings in his performance, but to facilitate the sale of the division in which he worked. Scribner claimed that his termination was "without cause" and attempted to exercise his options. WorldCom, however, claimed that although Scribner had not been let go for deficient performance, his termination was nonetheless "with cause" for stock option purposes. Scribner sued. Both parties filed motions for summary judgment; the district court granted WorldCom's and denied Scribner's.

Scribner appeals, and this battle over the meaning of words is now before us. His lawyer has drawn our attention to an apt quote from Lewis Carroll, whose depictions of the reverse-logic of childhood fantasy worlds all too often resemble adult reality. Describing a confrontation between Alice and Humpty Dumpty as to the extent of language's elasticity, Carroll wrote:

> "I don't know what you mean by 'glory,'" Alice said.
>
> Humpty Dumpty smiled contemptuously. "Of course you don't-till I tell you.... When *I* use a word," Humpty Dumpty said in a rather scornful tone, "it means just what I choose it to mean-neither more nor less."
>
> "The question is," said Alice, "whether you *can* make words mean so many different things."

LEWIS CARROLL, *Through the Looking Glass, in* THE COMPLETE WORKS OF LEWIS CARROLL 154, 196 (1994).

Like Alice, we are of the opinion that language is not infinitely elastic. We conclude that, under the facts of this case, "termination with cause" could only mean termination for deficient performance. Summary judgment in favor of Scribner, not WorldCom, is appropriate, and, accordingly, we REVERSE.

## BACKGROUND

The essential facts of this case are not in dispute. Donald Scribner served as the vice-president of WorldCom's Operator Services Division from 1994 until mid–1997. Scribner was by all accounts an exemplary employee. In 1995, in recognition of his value to the company, WorldCom granted him an option to purchase 9,000 shares of WorldCom stock. In 1996, it granted him an option to purchase an additional 2,000 shares. These options were to vest and become exercisable over a period of several years. Scribner exercised these options as they vested, but in mid–1997, when this dispute arose, the

number of unvested options he held had grown to 10,000 due to stock splits.

WorldCom's Stock Option Plan ("The Plan") required generally that option holders be currently employed with WorldCom in order to exercise their options. The Plan provided that "subject to earlier termination as provided herein, any outstanding option and all unexercised rights thereunder shall expire and terminate automatically upon ... the cessation of the employment or engagement of the Optionee by the Company for any reason other than retirement, death, or disability." Scribner's contracts contained such an "early termination" exception, providing that his options would immediately vest if WorldCom terminated him "without cause." The pertinent language reads:

> the Option[s] shall vest and, subject and pursuant to the provisions of the Plan and this Agreement, shall be exercisable with respect to all of the Option Shares immediately upon ... any termination by the Company of the Employee's employment with the company by reason of the Employee's disability or *without cause.*

(emphasis added).

Scribner's contracts and the Stock Option Plan do not define the phrase "without cause," nor do they explain what would constitute termination "with cause." However, the Plan gives a Stock Option Committee appointed by WorldCom's Board of Directors ("the Committee") broad discretion to interpret the terms of the Plan and contracts made under it. Part of this discretion is the authority to determine whether or not terminations are "with cause" or "without cause." The Plan also provides that the Committee's determinations are "conclusive and binding on all Optionees." The Plan further instructs the Committee to exercise its authority in a manner consistent with the best interests

of WorldCom. However, the Plan precludes the Committee from amending existing option contracts without the consent of the option holders.

Scribner was terminated from WorldCom in late 1996, when WorldCom negotiated the sale of the Operator Services division to another company, ILD Communications, Inc. ("ILD"). To make the purchase viable, ILD needed Scribner and other essential employees who ran the division to come work for ILD. WorldCom therefore promised ILD that it would terminate Scribner and all other key Operator Service employees upon closing, and that it would not rehire any of those employees to fill other positions at WorldCom.

WorldCom management informed Scribner and other key employees of the upcoming sale in early 1997. It also told them that because ILD needed their expertise, they would be terminated from WorldCom and given an option to work for ILD. Thus, it was clear that Scribner's termination was not caused by any inadequacy of performance. Several months later, however, WorldCom told these employees that their terminations would be considered "with cause" for stock options purposes. The Committee also determined that Scribner and other terminated employees could purchase seven-twelfths of the shares that had been scheduled to vest on January 1, 1998, *if* they agreed to go to work for ILD. In order to exercise even this partial option, however, terminated employees had to release WorldCom from all liability arising from their termination and their option contracts. At this time, WorldCom informed the terminated employees that the Committee had treated unvested stock options in the same manner in two previous transactions in which WorldCom divisions had been sold.

Scribner, however, claimed that his termination was "without cause," and refused to sign the release. He also attempted to exercise all of his remaining options, which would have vested in 1998 and 1999. WorldCom refused his tender, claiming his termination was "with cause." The dispute in this case thus centers around the meaning of the word "cause," and the extent of the Committee's authority to define-or redefine-that word.

## DISCUSSION

### A. Jurisdiction and Standard of Review

██ We have jurisdiction under 28 U.S.C. § 1291. We review a district court's summary judgment *de novo. See, e.g., Lopez v. Smith,* 203 F.3d 1122, 1131 (9th Cir.2000) (en banc). We must determine whether there are genuine issues of material fact such that a trial is necessary, and whether the district court properly applied the substantive law. *See id.* While we must view the evidence in the light most favorable to the non-moving party, a mere scintilla of evidence or some "metaphysical doubt as to material facts" will not suffice to defeat summary judgment. *See Brinson v. Linda Rose Joint Venture,* 53 F.3d 1044, 1048 (9th Cir.1995).

██ Finally, we have jurisdiction to review the district court's denial of Scribner's summary judgment motion as well as its grant of summary judgment to World-Com. *See, e.g., Jones–Hamilton Co. v. Beazer Materials & Servs. Inc.,* 973 F.2d 688, 693–94 (9th Cir.1992) (holding that a grant of summary judgment in favor of one party creates a final judgment allowing appellate review of denial of opposing party's summary judgment motion).

### B. The Meaning of the Word "Cause"

██ We must first decide what "with cause" and "without cause" mean under the Plan and Scribner's stock option contracts. The parties have not cited, and we have not found, any Washington case dealing specifically with stock option contracts. However, cases from other jurisdictions involving such contracts suggest that there is nothing unique about them, and that general rules of contract law should be used to interpret them. *See, e.g., Raybuck v. USX, Inc.,* 961 F.2d 484 (4th Cir.1992); *Weir v. Anaconda Co.,* 773 F.2d 1073 (10th Cir.1985); *Langer v. Iowa Beef Packers, Inc.,* 420 F.2d 365 (8th Cir.1970); *McIntyre v. Philadelphia Suburban Corp.,* 90 F.Supp.2d 596 (E.D.Pa.2000). These cases also make clear that, as with any contract, determination of parties' rights under a stock option contract is a fact-specific inquiry. We therefore look to the specific language of the Plan and Scribner's contracts, the facts of this case, and general contract interpretation principles as set forth by Washington courts to guide our analysis as to what "cause" means. All of these factors indicate that a termination "with cause" means a termination due to some fault of the employee.

#### 1. Washington Law

██ In interpreting contracts, Washington courts determine the parties' intent not just from the plain language of the contract, but from all the surrounding circumstances. *See Berg v. Hudesman,* 115 Wash.2d 657, 801 P.2d 222 (1990). The *Berg* court stated:

> Determination of the intent of the contracting parties is to be accomplished by viewing the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties.

*Berg,* 801 P.2d at 228 (quoting *Stender v. Twin City Foods, Inc.,* 82 Wash.2d 250, 510 P.2d 221 (1973)). Washington courts also give words their ordinary meaning "unless otherwise defined by the parties or by the dictates of the context." *See, e.g., Blue Mountain Mem'l Gardens v. State Dept. of Licensing, Cemetery Board,* 94 Wash.App. 38, 971 P.2d 75, 77 (1999).

### 2. Analysis

In light of these principles, "cause" as used in Scribner's contracts can only mean some shortcoming on the part of the employee. Washington cases indicate that, in the employment context, "cause" carries this meaning. For example, the Washington Court of Appeals has held that the ordinary meaning of "[t]ermination for good cause shown" is "some cause[ ] inherent in and related to the qualifications of the employee or a failure to properly perform some essential aspect of the employee's job function." *Comfort & Fleming Ins. Brokers, Inc. v. Hoxsey,* 26 Wash.App. 172, 613 P.2d 138, 141 (1980). Numerous Washington employment cases have also used the term "cause" to mean some failing of the employee. *See, e.g., Baldwin v. Sisters of Providence in Washington, Inc.,* 112 Wash.2d 127, 769 P.2d 298, 299 (1989) (en banc) (allegations of sexual abuse by patient); *Nelson v. Southland Corp.,* 78 Wash.App. 25, 894 P.2d 1385, 1385 (1995) (violations of store policies); *Hill v. J.C. Penney, Inc.,* 70 Wash.App. 225, 852 P.2d 1111, 1114 (1993) (theft of store property).

Additionally, one of WorldCom's Committee members admitted that the term "cause" is susceptible to an ordinary meaning. Discussing how the Committee determined whether Scribner's termination had been with or without cause, this Committee member stated: "[I]t is not a question of somebody being terminated for cause *in the normal sense* of an employee being terminated for cause. Rather, *it is the choice of words that is used to bring the vesting mechanism to a conclusion under the language in the plan itself.*" (emphases added).

Thus, the term "cause" is ordinarily a performance-related concept. Unless WorldCom can point to something in the Plan, the contracts, or the context in which they were drafted that would define "cause" otherwise, we must give the word its ordinary meaning. *See Blue Mountain Mem'l Gardens,* 971 P.2d at 77. We cannot allow one party's "double-secret" interpretation of a word to undermine the other party's justified expectations as to what that word means.

In this case, nothing in the contracts, the context, or the subsequent acts of the parties supports the notion that "cause" does not carry its ordinary, performance-related meaning. The Plan and the contracts do not define "cause," other than to say that the Committee has authority to interpret contract terms and make for-cause determinations. The context in which the contract was drafted also indicates that cause is a performance-related concept. Scribner, after all, was WorldCom's employee, and he earned the stock options as a result of his superior performance. WorldCom's own employee handbook, which specifies a variety of transgressions constituting "cause" for firing, shows that WorldCom used the phrase "with cause" to refer to performance-related reasons for termination. Thus, a reasonable employee in Scribner's position would assume that "cause" meant some failing on his part.

WorldCom's post-contracting actions do not lead to a different conclusion. In 1995, after entering into the first option contract, WorldCom sent Scribner the following notice:

an employee's employment with the Company will be deemed terminated with cause (not without cause) if such termination occurs by reason of the elimination or consolidation of such employee's position or function *and the decision by such employee not to serve the Company in another position or function available within the Company.*

(emphasis added). This notice is unremarkable, given that the Plan generally provided that option holders had to be employed with WorldCom in order to retain their options. It simply shows that if an employee chose to leave, he would not be considered "terminated without cause." The notice thus underscores the reasonableness of Scribner's assumption that the decision whether a termination was "with cause" would be based on things within his control, such as poor performance, or, at the very least, voluntary departure. Contrary to WorldCom's argument, the notice does not indicate that WorldCom could deem terminations completely outside an employee's control to be "with cause."

WorldCom also emphasizes the two previous occasions in which the Committee had deemed the termination of employees whose positions were eliminated upon the sale of a division "with cause" rather than "without cause." These previous transactions do not justify granting WorldCom's motion for summary judgment, and are insufficient to defeat Scribner's. First, Scribner had no knowledge of these transactions until the Committee had already decided that his termination was "with cause." Moreover, while Scribner's contracts provided that the Committee could construe contract terms, they also provided that the Committee could not amend the contract. Therefore, that WorldCom's prior similar actions had gone unchallenged has no bearing on the present situation.

In light of Washington law, the language of the contract, the context in which it was drafted, and the subsequent dealings of the parties, we hold that "cause" is a performance-related concept. WorldCom concedes that Scribner's termination was not due to any deficiency on his part. Scribner was therefore terminated "without cause" as a matter of law, and summary judgment in his favor is appropriate.

**C. The Committee's Discretion to Interpret the Contracts and the Duty of Good Faith and Fair Dealing Do Not Change the Outcome**

 To support its argument that it was entitled to summary judgment, WorldCom relies on the Plan's broad grant of discretion to the Committee to interpret contract terms. We do not dispute that the Committee had broad discretion to construe the Plan, but note that it nonetheless had a duty to exercise its interpretive authority in good faith. *See, e.g., Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.,* 86 Wash.App. 732, 935 P.2d 628, 632–33 (1997). "The duty of good faith and fair dealing applies when one party has discretion to determine certain terms of the contract." *Id.*

 WorldCom contends that Scribner has not presented any evidence that the Committee acted in bad faith in deciding that his termination had been "with cause." This argument fails. WorldCom misunderstands the concept of good faith. Scribner need not show that the Committee acted with affirmative malice towards him, or even that it knew its decisions were inappropriate when it made them. The Committee could breach the duty of good faith and fair dealing simply by disregarding Scribner's justified expectations under the stock option contracts. Scribner has presented ample evidence that the Committee did breach this duty.

### 1. Meaning of Good Faith and Limits of Discretion

The thrust of WorldCom's argument that there is no evidence of bad faith is that Scribner must show that WorldCom did not have a good reason for terminating him, or that the Committee acted without "honesty or lawfulness of purpose." *Tank v. State Farm Fire & Casualty Co.*, 105 Wash.2d 381, 715 P.2d 1133, 1136 (1986) (en banc). We do not question that the Committee felt it was treating Scribner fairly and lawfully by allowing him to exercise some of his options, or that it honestly felt it was acting in the best interests of the company. These facts, however, are not dispositive, and WorldCom's argument mischaracterizes the law. That a party can breach the duty of good faith and fair dealing by acting dishonestly or unlawfully does not mean that dishonesty or an unlawful purpose is a necessary predicate to proving bad faith.

Several Washington cases have come to this conclusion, at least in the context of insurance contracts. In *Tank*, for instance, the Washington Supreme Court stated that the duty of good faith implies more than honesty and lawfulness of purpose. *Tank*, 715 P.2d at 1136; *see also, Tyler v. Grange Ins. Ass'n*, 3 Wash.App. 167, 473 P.2d 193, 199 (1970). However, because these cases involve the unique context of insurance contracts, in which the insurer may have heightened duties to the insured, we turn to other authorities to assess how the Washington Supreme Court would decide this issue in the context of employment contracts. *See, e.g., Strother v. Southern California Permanente Med. Group*, 79 F.3d 859, 865 (9th Cir.1996) (noting that in the absence of on-point authority from a state's highest court, federal courts interpreting state law turn to the decisions of the state's intermediate appellate courts, decisions of other jurisdictions, statutes, treatises, and restatements).

Commentary to the Second Restatement of Contracts refutes World-Com's argument. The comments provide that "[g]ood faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." RESTATEMENT (SECOND) OF CONTRACTS, § 205, cmt. a (1979). The commentary also states that "[s]ubterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified.... [F]air dealing may require more than honesty." *Id.* at cmt. d. It also provides that "evasion of the spirit of the bargain" will constitute bad faith. *Id.* The Oregon Supreme Court has adopted this commentary, holding that the good faith doctrine exists to "effectuate the reasonable contractual expectations of the parties." *Best v. United States Nat'l Bank of Oregon*, 303 Or. 557, 739 P.2d 554, 558 (1987).

*Best* and the Restatement's commentary have the force of logic, and we believe that Washington courts would follow these principles if faced with a question like the one before us. Good faith *limits* the authority of a party retaining discretion to interpret contract terms; it does not provide a blank check for that party to define terms however it chooses. WorldCom has never explained what standards the Committee used in making "with cause" decisions, or pointed to a single situation that it would consider a "without cause" termination. Although WorldCom acknowledges that the Committee's discretion could not be wholly unfettered, it has never explained what, exactly, fettered its discretion. Instead, it has simply argued that cause does not mean what Scribner thinks it means. This lack of explanation leads us to conclude that the Committee,

like Humpty Dumpty, felt that the word "cause" could mean whatever it wanted it to mean. Even granting that the Committee had broad discretion to interpret the contract, we find this to be an unreasonable result that Washington courts would disfavor. *See, e.g., Berg,* 801 P.2d at 228–29.

■ We therefore conclude that the discretion retained by the Committee was the discretion to determine whether Scribner had in fact been terminated for deficient performance. The Committee did not retain the power to redefine the term "cause" in a way that would undermine Scribner's justified expectations as to what that word meant. Although the Committee had broad discretion to *interpret* the contract, it did not have the authority to *redefine* its terms. The contract and the context in which it was drafted indicate that "cause" can only mean termination for performance-related reasons. The discretion retained by the Committee allowed it to determine, as a factual matter, whether Scribner had been terminated for performance-related reasons, but did not authorize it to change the ordinary meaning of words after the fact and without notice.

### 2. Scribner's Evidence

Finally, Scribner has submitted ample evidence of the Committee's failure to exercise its discretion in good faith. Several members of the stock option Committee testified that they determined Scribner's termination to be "with cause" specifically in order to prevent his options from vesting. Despite the Plan's clear provisions that non-employees could sometimes retain their stock options, several committee members testified that they thought "it did not make sense" for persons no longer employed with WorldCom to have stock options. For example, the following exchange occurred during the deposition of one Committee member:

Q: Could you explain to me what standard you employed as a member of the stock option committee in determining that the Operator Services division employees were being terminated with cause?

A: Well as I understood it, cause basically was termination, that was the event it came from. . . . That basically was a business decision relating to the policies of the committee and its feelings about an employee of WorldCom retaining their options and a person that wasn't employed losing their options.

Another Committee member testified in a similar vein:

[M]y basic philosophy, and I sit on a number of compensation committees, is that the stock option program is an incentive for employees to produce the best possible results for the investors, and when they're no longer employed, those option plans don't mean much. . . . Stock options are not a right. . . . And with that philosophy in mind, it isn't something that goes on in perpetuity after they leave the company.

Testimony of yet another member indicates that the Committee first decided that it would be inappropriate to allow non-employees to retain stock options, and made its "with cause" determination accordingly:

Q: And what was the rationale for so interpreting the stock option plan?

A: As I said earlier, to stop the vesting.

Thus, Scribner has presented ample evidence demonstrating that rather than making a good faith effort to determine whether his termination had been "with cause" or "without cause" based on language of the Plan and his justified expecta-

tions, the Committee chose its desired result, and then applied the label necessary to bring that result about. Nothing more is required to show a lack of good faith.

### CONCLUSION

To summarize, we hold that the terms "with cause" and "without cause" as used in the Stock Option Plan and Scribner's contracts are performance-related concepts having to do with some deficiency on the part of the employee. We also hold that the Committee's discretion to construe the contract did not give it the authority to redefine its terms or undermine Scribner's justified expectations as to what those terms meant. WorldCom has presented no reliable evidence indicating why "cause" does not refer to employee performance. Scribner is therefore entitled to summary judgment. Accordingly, we reverse the district court's summary judgment in favor of WorldCom, remand the case to the district court, and instruct it to enter summary judgment in favor of Scribner.

**REVERSED AND REMANDED.**