Christopher T. BEIDEL, Plaintiff-Appellant,

v.

SIDELINE SOFTWARE, INC.,Defendant-Respondent,

Michael C. HALL and Kevin C. Austin, Defendants.†

Court of Appeals

*No. 2011AP788. Oral argument January 10, 2012.*
*—Decided February 22, 2012.*

2012 WI App 36

(Also reported in 811 N.W.2d 856.)

† Petition for review filed 4/16/12.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Michael J. Aprahamian* and *Brian P. Keenan* of *Foley & Lardner LLP*, Milwaukee. There was oral argument by *Michael J. Aprahamian*.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Kim Grimmer* and *Travis James West* of *Solheim Billing & Grimmer, S.C.*, Milwaukee. There was oral argument by *Kim Grimmer*.

Before Fine, Brennan and Hoover, JJ.

¶ 1. FINE, J.   Christopher T. Beidel appeals the circuit court's order denying his motion for reconsideration of an earlier order of the circuit court that dismissed the first count of his amended complaint against Sideline Software, Inc.[1] Sideline Software is a fantasy-

---

[1] The Honorable John J. DiMotto granted partial summary judgment to Sideline Software. The Honorable William W. Brash, III, entered the order denying Beidel's motion for reconsideration, and entered the order dismissing Beidel's entire claim against Sideline Software in light of Beidel's concession that he could not prevail in light of Judge DiMotto's ruling. Beidel's notice of appeal, however, mischaracterizes Judge Brash's order as a "judgment." We ignore this error. *See* Wis. Stat. Rule 805.18(1) ("The court shall, in every stage of an action, disregard any error or defect in the pleadings or proceedings which shall not affect the substantial rights of the adverse party.") (made applicable to appellate procedures by Wis. Stat. Rule 809.84). Further, Beidel's notice of appeal also encompasses Judge DiMotto's order, although it does not reference it. *See* Wis. Stat. Rule 809.10(4) ("An appeal from a final judgment or final order brings before the court all prior nonfinal judgments, orders and rulings adverse to the appellant

football software company. Beidel contends that the circuit court erred by holding that a stock-repurchase agreement between him and Sideline Software was not triggered by what he contends was his constructive discharge as a Sideline Software employee, and that he was not, therefore, entitled to succeed on his claim for specific performance of that agreement. We reverse and remand for further proceedings.

## I.

¶ 2.   Beidel and Michael C. Hall incorporated Sideline Software in 1998. Hall was the bare-majority stockholder with 2,505 shares of Sideline Software stock; Beidel had 2,495 shares. Hall and Beidel entered into a stock repurchase agreement, which, as material, provided that if a shareholder (that is, Hall or Beidel) were fired without cause, Sideline Software would buy that shareholder's stock at an agreed price. The clause, section 6 of the Agreement, reads:

> Termination of Employment Without Cause; Shareholder's Put Option. Upon the termination of a Shareholder's employment with Sideline without cause (as defined in section 7(b) below), the terminated Shareholder shall have a continuing option to sell all or any part of the Stock owned by him, and upon exercise of such option, Sideline shall have the obligation to purchase all of Shareholder's Stock so elected for sale by such Shareholder, at the price and on the terms provided in sections 8 and 9 below. Provided, however, that such purchase and sale shall be subject to the restrictions and limitations set forth in section 11

and favorable to the respondent made in the action or proceeding not previously appealed and ruled upon."). The amended complaint's claims asserted against Michael C. Hall and Kevin C. Austin are not at issue on this appeal.

hereof. The terminated Shareholder shall exercise such option by providing 30 day's [*sic*] prior written notice to Sideline of his decision to sell his Stock.

(Underlining and capitalization in original.) Section 7(b) defined "cause" as:

(i) the commission of a felony or a crime involving moral turpitude or the commission of any other act or omission involving dishonesty, disloyalty or fraud with respect to Sideline, (ii) failure to devote his entire business time to the business of Sideline (subject to normal vacation leave or time off, illness or sick leave, or other periods of permitted absence), (iii) conduct tending to bring Sideline into substantial public disgrace or disrepute, (iv) gross negligence or willful misconduct with respect to Sideline, or (v) any material breach of this agreement.

Sideline Software does not contend that Beidel did anything that would be "cause" under this subsection.

¶ 3. Section 8 of the Agreement had an initial stock-valuation of "$400 per share," and also provided that the valuation could be adjusted by the shareholders' agreement in writing.[2] Section 8 also provided:

- "If no review of the Purchase Price is undertaken, the Purchase Price set forth in the prior year(s) shall continue in effect unless a period of 24 months expires from the last time in which Shareholders and Sideline stipulated a Purchase Price." (Section 8(b))

- "If the Purchase Price has not been stipulated within the 24 months prior to a Purchase Event, and a Purchase Event occurs, the Purchase Price shall be the fair market value of the Stock as determined by an appraiser selected by Sideline." (Section 8(c))

[2] Sections 9 and 11 are not material to this appeal.

¶ 4.   Over the years, Hall and Beidel agreed to varying valuations of Sideline Software stock for the repurchase agreement. The last stipulated price was agreed to in a document signed by both Hall and Beidel, dated March 6, 2007. It provided for a per-share valuation of $1,600, and thus expired twenty-four months later because Hall and Beidel never agreed on a new valuation.

¶ 5.   Section 10(b) of the Agreement provides that if there is a purchase under section 6 (the termination without cause provision), "the date of Closing shall be within 90 days after the exercise of an option described in such section." As we see in greater detail below, Beidel purported to exercise his option under section 6 on January 20, 2009, which was well before the expiration of the $1600–per-share valuation, even if the thirty-day notice requirement in section 6 delayed the effective date of the purported exercise of the option until February 19, 2009. Contrary to Sideline Software's contention in its brief, the ninety-day window for the "closing" does not mean that exercise of the option could be delayed by Sideline Software until the ninetieth day; indeed, at oral argument before Judge DiMotto, Sideline Software's lawyer acquiesced in the circuit court's assessment that under the Agreement, Beidel's purported exercise of the section 6 option on January 20, 2009, was timely if it was effective.[3]

---

[3] THE COURT:   ... So you know, the bottom line is it — yeah, it [exercise of the option] did have to be done before March 7th. And by doing it on January 20th, that was done timely.

[SIDELINE'S LAWYER]:   If they can prove an actual discharge.

THE COURT:   ... I mean in order to rely on the stock repurchase agreement to get to do the put option and to get $1,600 per share for the 2,495 shares, it had to be before March 7th, it had

¶ 6. Section 13 of the Agreement provided, as material, "If a controversy arises concerning the right or obligation to purchase or sell any of the shares of Stock, such right or obligation shall be enforceable in a court of equity by a decree of specific performance." Beidel's amended complaint sought specific performance of the Agreement, contending that the circuit court "should order Sideline to purchase 2490 of Beidel's shares at a price of $1,600 per share, for a total purchase price of $3,984,000."[4] Sideline Software does not want to pay this amount, and argues that Beidel was never terminated as a Sideline employee before the expiration of the $1,600 valuation, and that thus Beidel's shares should be valued by appraisal as provided for in section 8 of the Agreement. Beidel contends that although he was never let go, Hall so reduced his responsibilities and duties that he was constructively discharged, without cause, within twenty-four months of the last price-per-share stipulation, and that this was all part of Hall's scheme to not pay Beidel the $1,600 per share, and was part of Hall's plan to replace Beidel with Austin.

to be at least 30 days in advance, and it required a termination without cause. So they've got to prove that these facts constitute termination.

[SIDELINE'S LAWYER]: I understand. I understand that, Your Honor. Thank you.

As we see below, under Beidel's claim for specific performance, he did not necessarily have to prove a "termination"—either actual or constructive—before March 7, 2009, in order for the circuit court to consider whether Beidel could prevail under a balancing of equities required by an action for specific performance.

[4] The Record is not clear why Beidel's amended complaint sought specific performance for 2,490 shares of stock when he owned, as the circuit court recognized, 2,495 shares.

¶ 7.  The parties point us to the following facts in the Record that they say support their respective positions.

*Beidel:*

- An electronic note of October 16, 2007, from Hall to Beidel:  "But to be honest, I don't see a future path anymore with all 3 of us [Hall, Beidel, and Austin] involved, so in my mind, we'll need to focus on some drastic measure to figure out the future of Sideline Software . . ." (Ellipses in original.)

- In the fall of 2008, another company, OPEN Sports Network, Inc., approached Sideline Software and explored what Beidel's affidavit calls "a possible purchase of Sideline." Hall discussed this with Beidel "on or about September 26, 2008."

- Beidel's affidavit avers that "on October 6, 2008, Hall sought advice from Tom Solheim, counsel for Sideline, about the implications of the right of first refusal that both he and I had under the Stock Repurchase Agreement and how that right might imperil the negotiations with Open Sports."

- According to Beidel's affidavit, Hall then spoke to him about Beidel's future with Sideline Software:

  On October 7, 2008, I had a phone call with Hall in which he said in no uncertain terms that he planned on firing me the following March, after the $1600 per share stipulated price would expire. He again expressed his intention to do so in a phone call we had one week later. Although Hall has said in the course of this lawsuit that it was only "an option" that was "potential," that is not what he said at the time. Hall said that he intended to fire me and there were no other options presented for me to stay with the company.

- Beidel's affidavit also asserts: "On October 9, 2008, Hall told me that he would accept an offer of $10 million from Open Sports. I agreed that this would be an acceptable offer and that this number was consistent with our stipulated price."

- Hall and Beidel planned to meet on December 22, 2008, and Hall's agenda recited in part: "Discuss Transition of duties (between now and April, 2008)." (Capitalization in original.) Beidel avers that "2008" "was a typo, and should have read 2009." Sideline Software does not dispute this.

- On December 22, 2008, Beidel and Hall exchanged the following electronic notes before the meeting (bolding and formatting in original):

  **"Chris (12/22/2008 11:50 AM):**

  looking over your agenda for today's meeting, it still sounds like you plan on terminating me after the stipulated price has expired, is that still the case?

  **fflmike** (12/22/2008) 11:51 AM):

  yes, that's the gist of what I feel my best option is."

- Hall and Beidel met on December 22, 2008. Beidel's affidavit described the meeting: "He again informed me in no uncertain terms that I would be terminated once the stipulated purchase price expired. In the meeting, he asked me to explain how to do the duties I had performed so that they could easily be transitioned."

- Beidel's affidavit related that "[i]n response to Hall's request that I document the tasks I performed such that they could be transitioned to others, I created a 19–page document (containing numerous links to other documents) which listed each task I performed at the company and explained how to perform it." Beidel says that he sent the document to Hall on January 7, 2009.

441

- According to Beidel's affidavit, "Hall began transfer-ring my duties to others as he said he would do."

- By letter dated, January 20, 2009, Beidel purported to exercise his option to have Sideline Software buy his stock at the $1,600 per share price. The letter, as material, asserted:

  This letter does *not* constitute my voluntary termination of employment with Sideline, but is only meant as notice of exercise of my Put Option.

  As you have stated to me several times both verbally [*sic* "orally"?] and in writing, you have decided to terminate my employment with Side-line, without Cause (as defined in the Buy/Sell). You've already stripped me of my job responsi-bilities, and Sideline has not paid me any salary since December 31, 2008. Therefore, my employ-ment has already been terminated by Sideline, and there is no reasonable or rational basis for Sideline to claim that my termination was for Cause.

  As you've stated, you had hoped to delay my formal termination date to simply get beyond the effective date of our mutually agreed upon stipulated price of $1,600 per share (pursuant to the Buy/Sell and the Stipulation of Purchase Price dated March 6, 2007 (the "*Stipulation*")). Notwithstanding and as stated above, you've already terminated my employment with Side-line.

(Underlining and capitalization in original.)

- Beidel's affidavit avers that after the January 20 letter, "Hall suddenly reversed course. Instead of continuing to transition all of my duties to others, he began assigning ad hoc tasks for me to perform,

even though he had said that I would be terminated and that all my duties would be transitioned to others."

- Beidel asserts in his affidavit that he "continued to perform some tasks [for Sideline Software] after January 20, 2009. I did so not because I believed I was still an employee, but because I remained a director and shareholder of Sideline and did not want the company to be hurt during the transition." He also said this at his deposition:  "I thought it was in my best interest as a director and a shareholder to continue doing the tasks that Mike decided he no longer wanted to take over." Beidel says that he told Hall that although he was willing to do the things Hall asked him to do, he believed "that I had been terminated as an employee and that I was reserving all my rights."

¶ 8.  During oral argument, Sideline Software's lawyer conceded that if Beidel had not continued to work as directed by Hall, he could have been fired for "cause" under the repurchase agreement. Beidel thus had what was for him three unpalatable options: (1) quit and fight the contention that he voluntarily resigned; (2) continue to do things for Sideline Software that Hall told him to do and risk the contention that he had not been "terminated" as that concept is used in section 6 of the stock-repurchase agreement; or (3) not comply with Hall's direction that he do things for Sideline Software, and risk being fired for cause.

*Sideline Software:*

- Beidel never resigned.

- Beidel admitted in his deposition that there was nothing in writing or orally that, as phrased by

Sideline Software's lawyer, "guaranteed you the right to perform certain duties as an employee of Sideline."

- Beidel also agreed at his deposition with Sideline Software's lawyer that Beidel "continued to perform [work involving] corporate finances, accounting, corporate administration, and human resources up to January 20 of 2008." (Sideline Software's brief on this appeal cites this testimony as supporting its assertion that: "Beidel continued to perform corporate finances, accounting, corporate administration, and human resources from June 2008 through January 20, 2009 and beyond." We accept for the purposes of this appeal, the assertion in Sideline Software's brief, and assume that the transcript use of "2008" is an error.)

- As Sideline Software asserts in its brief, "Beidel worked on marketing and advertising until the end of the 2008 fantasy football season in December 2008."

- Beidel prepared more than five payrolls after January 20, 2009, and did "payroll and the sales tax reports" through July, 2009.

- After January 20, 2009, Beidel "made a phone call and ordered the [Red Hat] licenses" for Sideline Software.

- After January 20, 2009, Beidel paid some bills for Sideline Software.

- After January 20, 2009, Beidel also did some work on what Sideline Software's lawyer characterized at Beidel's disposition as "server infrastructure and build-out."

- Beidel worked on, and "as of February 4 of 2009," submitted a "[press] release to the press" for Sideline Software.

444

- Beidel elected to remain "a covered insured" under Sideline Software's group health policy after August 31, 2009.

- Between December 4, 2008, and January 20, 2009, Hall never told Beidel "explicitly" that, as phrased by Sideline Software lawyer at Beidel's deposition, "he was taking marketing and advertising away from you as a responsibility."

- Hall also says in his affidavit:  "I informed Beidel in late 2008 that I wanted him to continue performing his responsibilities in the areas of marketing, advertising, publishing, accounting, finance, and computer hardware until he was in fact terminated."

- According to Hall's affidavit, "Beidel continued to work right up until January 20, 2009 and after" including:

  logging into "Sideline's on-line administration board to perform tasks or make written postings regarding tasks on Sideline's behalf more than 50 times after January 20, 2009";

  logging into "Sideline's administration board and approved at least 21 member registrations" between March and June, 2009, even though Hall "did not ask Beidel to do so";

  "Beidel continued to balance Sideline's checking account after January 20, 2009, until at least March of 2009."

- Hall says in his affidavit that he "assured Beidel in late 2008 that his 2009 pay rate would remain the same as it had been in 2008."

- According to Hall's affidavit, "Beidel had received over $269,000 in salary and shareholder distributions in 2008, with $139,680 in salary and distributions being received on or about December 31, 2008."

445

- Hall's affidavit also averred that given the nature of their fantasy-football business: "Neither Beidel nor I had ever received pay from the company after the end of the calendar year and during the [football] off-season. We would catch up on our annual salary once revenues started flowing into the company from league subscriptions in the summer and early fall."

- Sideline Software issued a check to Beidel in September of 2009 for the first nine months of that year, but Beidel never cashed it.

¶ 9.   As we have seen, the circuit court, the Honorable John J. DiMotto presiding, granted Sideline Software partial summary judgment dismissing Beidel's specific-performance claim against it. The circuit court opined:

> The plaintiff may not proceed on the specific performance claim against Sideline, Count I of the Amended Complaint, by claiming that he was constructively discharged. There is no genuine issue of material fact that one of the essential elements of a claim of constructive discharge, actual resignation by the employee, did not occur in this case.

¶ 10.   As noted, the Honorable William W. Brash, III, denied Beidel's motion for reconsideration.

## II.

██

¶ 11.   A court may only grant summary judgment if "there is no genuine issue as to any material fact" and a party "is entitled to a judgment as a matter of law." WIS. STAT. RULE 802.08(2). We review *de novo* a circuit court's summary-judgment rulings, and apply the gov-

erning standards "just as the trial court applied those standards." *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315–317, 401 N.W.2d 816, 820–821 (1987). Further, we look at the parties' submissions in a light most favorable to the party against whom summary judgment is sought, *Johnson v. Rogers Mem'l Hosp., Inc.*, 2005 WI 114, ¶ 30, 283 Wis. 2d 384, 401, 700 N.W.2d 27, 35, and all reasonable inferences are to be assessed against the party seeking summary judgment, *Lecus v. American Mut. Ins. Co. of Boston*, 81 Wis. 2d 183, 189–190, 260 N.W.2d 241, 244 (1977).

■

¶ 12. This appeal also requires us to apply the parties' contract. As with our review of the circuit court's ruling on summary judgment, our analysis of the contract is *de novo. See Wisconsin End–User Gas Ass'n v. Public Service Commission of Wisconsin*, 218 Wis. 2d 558, 564, 581 N.W.2d 556, 559 (Ct. App. 1998).

■

¶ 13. Sideline Software argues, and the circuit court agreed, that a claim for constructive termination does not lie unless the employee has resigned as a result of what the employer has done. *See Strozinsky v. School Dist. of Brown Deer*, 2000 WI 97, ¶ 83, 237 Wis. 2d 19, 66–67, 614 N.W.2d 443, 465–466 (In determining whether a resignation was voluntary or coerced, a fact-finder has to assess whether the employment "conditions were so intolerable that a reasonable person confronted with same circumstances would have been compelled to resign."). As Sideline Software noted at oral argument, the constructive-discharge theory is a defense to an employer's contention that the employee quit voluntarily (thus forfeiting rights that might accrue if the employee were fired). *See id.*, 2000 WI 97, ¶ 68, 237 Wis. 2d at 57, 614 N.W.2d at 461 ("Actual

discharge carries significant legal consequences for employers, including possible liability for wrongful discharge. In an attempt to avoid liability, an employer may refrain from actually firing an employee, preferring instead to engage in conduct causing him or her to quit. The doctrine of constructive discharge addresses such employer-attempted 'end runs' around wrongful discharge and other claims requiring employer-initiated terminations of employment."). As we have seen, Beidel never quit, and, indeed, did some things for Sideline Software even after he sent the January 20, 2009, letter claiming that he was, in effect, fired by Hall, and that this was a constructive discharge that triggered Sideline Software's stock-purchase obligation. If that is all that there were to this case, the constructive-discharge doctrine recognized by *Strozinsky*, would not apply because, as the circuit court noted, Beidel never resigned. But there is more, and we turn to that now.

■■

¶ 14. As we have seen, the amended complaint sought specific performance of the stock repurchase agreement at the per-share price of $1,600, and we explored with the lawyers at oral argument the special implications of that request for relief. A trial court weighing whether to order the specific performance of a contract must assess competing equities to determine whether and how the contract should be enforced. *See Venisek v. Draski*, 35 Wis. 2d 38, 51, 150 N.W.2d 347, 354 (1967) ("This being an action for specific performance the circuit court sits as a court of equity and should be able to fashion relief which will be equitable to both plaintiffs and defendants."). This is so because "[e]very contract implies good faith and fair dealing between the parties to it, and a duty of cooperation on

the part of both parties." *Chayka v. Santini,* 47 Wis. 2d 102, 107 n.7, 176 N.W.2d 561, 564 n.7 (1970) (quoted source and internal quotation marks omitted); *see also Bozzacchi v. O'Malley,* 211 Wis. 2d 622, 626, 566 N.W.2d 494, 495 (Ct. App. 1997) ("Every contract implies good faith and fair dealing between the parties to it.") (internal quotation marks omitted). Mere "compliance in form, not in substance" "breaches the covenant of good faith that accompanies every contract[.]" *Chayka,* 47 Wis. 2d at 107, 176 N.W.2d at 564. Thus, we have held that an employer who fires an at-will-employee to avoid paying the employee accrued benefits must still pay those benefits "if it fired her in order to not pay her." *Phillips v. U.S. Bank, N.A.,* 2010 WI App 35, ¶ 8, 324 Wis. 2d 151, 160–161, 781 N.W.2d 540, 545, *aff'd by an equally divided court,* 2010 WI 131, 329 Wis. 2d 639, 791 N.W.2d 190. Similarly, a principal may not avoid paying commissions to an agent who procured sales after he or she was fired when the sales were " 'on the verge of success' " and the agent can show "(1) that the agency was terminated by the principal to avoid paying the commissions; and, (2) that the agent was the 'procuring cause' of the sales." *Leen v. Butter Co.,* 177 Wis. 2d 150, 154, 501 N.W.2d 847, 848 (Ct. App. 1993) (quoted sources omitted). *See also Fortune v. National Cash Register Co.,* 364 N.E.2d 1251, 1255–1258 (Mass. 1977) (An employer may not fire an at-will employee merely to avoid paying accrued bonuses to that employee.)

■
¶ 15. The rule that parties to a contract act in good faith is universal. Thus, the black letter Restatement: **"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."** Restatement

449

(SECOND) OF (CONTRACTS) § 205 (1981) (bolding in original). The principle, as with the remedy of specific performance, is one of objective fairness:

> Subterfuges and evasions violate the obligation of good faith in performance *even though the actor believes his conduct to be justified.* But the obligation goes further: bad faith may be overt or may consist of inaction, *and fair dealing may require more than honesty.* A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

*Id.*, cmt. d (emphasis added). One of the Restatement's illustrations under this comment gives us a mooring:

> A, owner of a shopping center, leases part of it to B, giving B the exclusive right to conduct a supermarket, the rent to be a percentage of B's gross receipts. During the term of the lease A acquires adjoining land, expands the shopping center, and leases part of the adjoining land to C for a competing supermarket. Unless such action was contemplated or is otherwise justified, there is a breach of contract by A.

*Id.*, cmt. d, illus. 2. Thus, one party to a contract may not apply its literal terms when to do so violates the duty of good faith and fair dealing. *Scribner v. Worldcom, Inc.*, 249 F.3d 902 (9th Cir. 2001) illustrates this, and the circuit court may, in its discretion on remand, consider *Scribner* in connection with Beidel's assertion that Hall wanted to delay Beidel's termination until after expiration of the $1,600 valuation in order to facilitate the sale of Sideline Software to Open Sports.

Scribner owned unvested options to purchase shares of WorldCom stock, which were to become immediately exercisable if WorldCom terminated him "without cause." WorldCom eventually terminated Scribner, not because of shortcomings in his performance, but to facilitate the sale of the division in which he worked. Scribner claimed that his termination was "without cause" and attempted to exercise his options. World-Com, however, claimed that although Scribner had not been let go for deficient performance, his termination was nonetheless "with cause" for stock option purposes.

*Id.*, 249 F.3d at 905. The contract did not define "without cause." *Id.*, 249 F.3d at 906. The contract, however, gave a committee appointed by the board of directors:

broad discretion to interpret the terms of the [stock option] Plan and contracts made under it. Part of this discretion is the authority to determine whether or not terminations are "with cause" or "without cause." The Plan also provides that the Committee's determinations are "conclusive and binding on all Optionees." The Plan further instructs the Committee to exercise its authority in a manner consistent with the best interests of WorldCom. However, the Plan precludes the Committee from amending existing option contracts without the consent of the option holders.

Scribner was terminated from WorldCom in late 1996, when WorldCom negotiated the sale of the Operator Services division to another company, ILD Communications, Inc. To make the purchase viable, ILD needed Scribner and other essential employees who ran the division to come work for ILD. WorldCom therefore promised ILD that it would terminate Scribner and all other key Operator Service employees upon closing, and that it would not rehire any of those employees to fill other positions at WorldCom.

451

*Ibid.* (acronym omitted). In holding that despite WorldCom's contention (supported by the fact that in "two previous occasions in which the Committee had deemed the termination of employees whose positions were eliminated upon the sale of a division 'with cause' rather than 'without cause' ") to the contrary, the Committee violated the duty of good faith and fair dealing even though it subjectively acted in good faith: "The Committee could breach the duty of good faith and fair dealing simply by disregarding Scribner's justified expectations under the stock option contracts. Scribner has presented ample evidence that the Committee did breach this duty." *Id.*, 249 F.3d at 908, 909–911.

■■

¶ 16.   The circuit court, Judge DiMotto presiding, indicated it felt constrained by *Strozinsky* despite what it apparently saw as the equity behind Beidel's position:   "A strong argument can be made that this scenario is so strong that [constructive termination] should apply and there shouldn't be a requirement for an actual resignation, but I can't do that." The circuit court did not, however, consider the balancing of equities required in a case where a party seeks specific performance of a contract. Although the essential facts (who did and said what and when) may not be in real dispute, the parties dispute the inferences that can be drawn from those facts. As seen from their respective positions, outlined above, they each assert that the balance of the equities tips their way. We thus remand for the circuit court's determination where the bulk of the equities lie, including an evaluation of what the parties intended when they agreed to the stock repurchase agreement, and whether it should grant specific performance as Beidel requested. On remand, the circuit court, in the reasoned exercise of its discretion,

may decide that this requires an evidentiary hearing or it may decide that the summary judgment materials submitted by the parties suffice. The parties agreed at oral argument that because a claim seeking specific performance is an equitable action, there is no right to a trial by jury. *See Green Spring Farms*, 172 Wis. 2d at 33, 492 N.W.2d at 394 ("It is well settled that the right to a trial by jury does not extend to equitable actions."); *Gates v. Parmly*, 93 Wis. 294, 305–306, 66 N.W. 253, 257 (1896) (no right to a jury in an action for specific performance). We reverse and remand for further proceedings consistent with this opinion.[5]

*By the Court.*—Order reversed and cause remanded for further proceedings.

---

[5] Beidel has asked us to take judicial notice of the November 18, 2011 special verdict form from the jury trial of Beidel's claims against the remaining defendants. *See Beidel v. Sideline Software, Inc.*, No. 2009CV5862 (Milwaukee County Circuit Court, Nov. 18, 2011). Sideline Software opposed the motion. The motion is denied; the verdict does not affect either the result of this appeal or the analysis of this opinion.