# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-2211

_____

| | | |
|---|---|---|
| John D. Craig, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| The Pillsbury Non-Qualified Pension | * | |
| Plan; General Mills, Inc., | * | |
| | * | |
| Appellants. | * | |

_____

Submitted: January 11, 2006
Filed: August 14, 2006

_____

Before BYE and COLLOTON, Circuit Judges, and BOGUE,[1] District Judge.

_____

BYE, Circuit Judge.

The Pillsbury Non-Qualified Pension Plan (Plan) appeals the district court's[2] grant of summary judgment in favor of John Craig. The district court determined the

_____

[1]The Honorable Andrew W. Bogue, United States District Judge for the District of South Dakota, sitting by designation.

[2]The Honorable Michael J. Davis, United States District Judge for the District of Minnesota, adopting the Report and Recommendation of the Honorable Janie S. Mayeron, United States Magistrate Judge for the District of Minnesota.

Plan abused its discretion when it calculated Craig's pension benefits without including certain bonuses he received in 2001. We affirm.

I

John Craig began working for Pillsbury in 1989 when a subsidiary of his employer, Grand Metropolitan, Inc. (GMI), acquired Pillsbury. He moved from New Jersey to Minnesota to work in Pillsbury's tax department, performing tax services for both GMI and Pillsbury. He later became a Pillsbury vice president, and hence – in addition to being covered by Pillsbury's standard pension plan (which is not at issue in this case) – he was covered by Pillsbury's "top hat" plan, the Plan at issue in this case. A top hat plan is so called because it provides "deferred compensation for a select group of management or highly compensated employees," 29 U.S.C. § 1051(c), without being subject to the Internal Revenue Code's maximum annual benefit and compensation limits.

Craig retired in 2001, requiring the Plan to calculate his monthly pension benefit, a task complicated by a change of employment which occurred that year and which requires some background explanation. In 1998, GMI changed its name to Diageo. In 2000, Diageo announced Pillsbury would merge with General Mills. Craig worked on the merger, receiving offers from both Diageo and General Mills for employment after the merger's completion. Craig declined the offers. When the merger did not occur on its expected completion date, Diageo reclassified certain employees, including Craig. Effective January 1, 2001, employees staying with General Mills after the merger remained on Pillsbury's payroll, while those leaving were transferred to the payroll of Guinness United Distillers and Vintners North America (Guinness), a company owned by Diageo. Because Craig was not staying with General Mills after the completion of the merger, he became a Guinness employee on January 1, 2001. The merger was completed on November 1, 2001, and he retired soon after on December 31, 2001.

Craig's reclassification as a Guinness employee did not end his participation in the Plan. As a Diageo company, Guinness was an "affiliate" under the Plan. But unlike some affiliates, Guinness had not adopted Pillsbury's pension plans as its own, so it was considered a "non-adopting affiliate." Both the Plan and the Summary Plan Description (SPD) issued to Craig explained how a transfer to a non-adopting affiliate affected an employee's continuing participation in and entitlement to benefits under the Plan.

The SPD provided in relevant part:

> If you are transferred to another Pillsbury location or affiliate that is not covered by this Plan [i.e., a non-adopting affiliate], you will become an inactive participant in this Plan. During the time you are inactive, you will continue to earn continuous service, but not credited service. When your pension benefit is calculated, it will be based on your continuous service before and after the transfer, your credited service prior to your transfer, and the Plan benefit formula and your final average pay when you actually retire.

Appellant's App. at 102.

Section 3.5(b) of the Plan provided in relevant part:

> Any Participant who transfers into employment with an Employer or an Affiliate where such Participant becomes an Inactive Participant [i.e., employed by a non-adopting affiliate] shall continue to accrue Continuous Service (but not Credited Service) during the period of such employment. Any benefit such Participant may become entitled to shall be determined on the basis of Continuous Service before and after the date of such transfer, on the Credited Service before the date of such transfer, and on the Employee's Final Average Compensation and the applicable benefit formula under the Plan in effect at the Employee's termination of Continuous Service. Continuous Service for such

-3-

Employee will terminate and benefits under this Plan shall commence only after employment for an Employer or Affiliate terminates.

The Pillsbury Retirement Plan (Plan), Art. 3, § 3.5(b); App. at 16.

In 2001, Craig received $160,340 in regular pay and $185,383 in performance bonuses for a total of $345,723 which both Guinness and Pillsbury considered "pensionable pay," that is, earnings used to calculate a pension benefit. Craig also received two retention bonuses totaling $166,204[3] which Pillsbury would have considered pensionable pay if he had still been a Pillsbury employee at the time of retirement, but which Guinness did not consider pensionable pay. Thus, when the Plan asked Guinness to provide his 2001 compensation for the purpose of calculating his pension benefit, Guinness did not include the two retention bonuses, and the Plan calculated Craig's final average compensation using the $345,723 amount reported by Guinness.

Craig submitted a request for review contending the two retention bonuses should have been included. Inclusion of the two bonuses would increase his pension benefit by $546 per month for the three-year period from February 2005 through January 2008, and by $601 per month thereafter when he reached the age of 65. The Plan stood by its exclusion of the retention bonuses, indicating its practice "has consistently been to include compensation as determined by the last affiliate employer for use in the calculation of Final Average Compensation." App. at 133.

Craig appealed the Plan's decision administratively. The General Mills Minor Amendment Committee (Committee) responded to his appeal, explaining its use of the compensation figure reported by Guinness. According to the Committee, a literal

_____

[3]Although the two retention bonuses – one for $118,102 and a second "close of sale" bonus for $48,102 – were paid by Guinness, they reflected promises Pillsbury made to Craig to induce him to stay through the completion of the merger.

reading of the Plan would not allow *any* compensation Craig received from a non-adopting affiliate in the calculation of his final average pay. [4] However, because a literal interpretation of the Plan would cause some vested pensions to, in effect, disappear (or be significantly reduced) for an employee who transferred to a non-adopting affiliate for an extended period of time prior to retiring,[5] the Plan indicated it was using its discretion to use the amount of compensation reported by a non-adopting affiliate rather than no compensation at all.

After the Plan made a final decision denying Craig's appeal, he filed an action against the Plan in federal district court. Cross-motions for summary judgment were referred to a magistrate judge for a report and recommendation to the district court.

_____

[4]The Plan's argument can be summarized as follows: 1) the Plan's definition of "Compensation" limits the term to compensation paid by an "Employer;" 2) the term "Employer" includes only affiliates who adopt the Pillsbury plan, and thus excludes non-adopting affiliates; and 3) the phrase "Final Average Compensation" incorporates the term "Compensation," and therefore does not include compensation paid by a non-adopting affiliate.

[5]The Plan requires final average compensation to be calculated using 1) the five highest compensated years out of the last ten years of continuous service, or 2) the average monthly compensation for the last sixty months of continuous service, but also requires years after transfer to an affiliate to count as years of continuous service. Plan, Art. 3, § 3.5(b); App. at 16. Thus, if the Plan excludes compensation from a non-adopting affiliate, a longstanding employee who transfers to such an affiliate for an extended period of time prior to retiring may not receive any monthly pension benefit at all. For example, consider an employee who built up a sizeable pension with Pillsbury over twenty years, but then transferred to a non-adopting affiliate for the last ten years of employment. During the last ten years, the employee's compensation would be $0 each year if the Plan excluded compensation from a non-adopting affiliate. The Pillsbury pension would be calculated using the top five of those last ten years of continuous service, or five times $0 for a total of $0 (or the average monthly compensation for the last sixty months, which would still be $0). Thus, the ten years of service for a non-adopting affiliate would effectively eliminate the sizeable pension the employee acquired before leaving Pillsbury.

-5-

Concluding the plain language of the Plan, as well as the SPD, required all bonuses to be included in the calculation of Final Average Compensation, the magistrate judge recommended Craig's motion for summary judgment be granted and the Plan's motion be denied. The district court adopted the magistrate judge's report and recommendation. This timely appeal followed.

## II

We review the district court's grant of summary judgment de novo, applying the same standards as the district court. Fuller v. Hartford Life Ins.Co., 281 F.3d 704, 706 (8th Cir. 2002). The parties disagree about whether the district court should have reviewed the Plan's decision de novo or for an abuse of discretion. The Plan contends its decision should be reviewed under an abuse-of-discretion standard because 1) the Plan gives its administrator discretion to interpret the Plan document and 2) the circumstances required to trigger less deferential review under Woo v. Deluxe Corp., 144 F.3d 1157, 1160 (8th Cir. 1998), are not present. Craig claims de novo review applies because this case involves a top hat plan. The district court did not determine which standard applies to a top hat plan, concluding the outcome would be the same under either standard.

The Third Circuit has concluded de novo review applies to top hat plans even when they give their administrators interpretive discretion because "a top hat administrator has no fiduciary responsibilities" under ERISA. Goldstein v. Johnson & Johnson, 251 F.3d 433, 443 (3d Cir. 2001). We agree. "[T]op hat plans should be treated as unilateral contracts" and reviewed "in accordance with ordinary contract principles" because the policy considerations relied upon in Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989), to trigger abuse-of-discretion review (i.e., "the Supreme Court's analogy to trust law, and particularly the fiduciary responsibilities possessed by administrators with discretionary authority") are simply not present in the case of a top hat plan. Id.

-6-

The fact that we conduct a de novo review does not, however, alter our analysis as much as it might appear at first blush. As noted, the Plan grants its administrator discretion to interpret its terms. This "grant of discretion must be read as part of the unilateral contract itself. As a term of the contract, it must be given effect as ordinary contract principles would require[.]" Id. at 444. "Ordinary contract principles require that, where one party is granted discretion under the terms of the contract, that discretion must be exercised in good faith – a requirement that includes the duty to exercise the discretion reasonably." Id.; see also Scribner v. Worldcom, Inc., 249 F.3d 902, 909 (9th Cir. 2001) ("The duty of good faith and fair dealing applies when one party has discretion to determine certain terms of the contract.") (quoting Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc., 935 F.2d 628, 632-33 (Wash. Ct. App. 1997)). Thus, ultimately, we must determine whether the Plan's decision was reasonable. We conclude it was not.

As the district court noted, the Plan unambiguously provided "Compensation" included bonuses: "'Compensation' means the following amounts paid to an Employee by an Employer: salary, including pay for time not worked, overtime, *bonuses*, and commissions received as cash, plus accrued incentive earnings earned by and credited to the Employee under an Employer incentive plan[.]" Plan, Art. 2, § 2.1(k)(2); App. at 8 (emphasis added). The definition of "Final Average Compensation" then incorporated the term "Compensation" by providing "Final Average Compensation" means:

[A]n amount equal to the larger of –

> (1) an amount equal to the average monthly *Compensation* during the five consecutive calendar years of Continuous Service (or all such years, if fewer than five), out of the last ten (or fewer) calendar years of Continuous Service, for which such average is highest; or

(2) the average monthly *Compensation* during the last 60 months (or all such months, if fewer than 60) of Continuous Service.

Id. at Art. 2, § 2.1(x); App at 12 (emphasis added).

The SPD was even more straightforward in indicating bonuses were included in the computation of final average compensation:

Your final average pay is equal to the greater of your average monthly earnings for the five consecutive highest-paid years out of the last 10 years or your average monthly earnings for the last 60 months before leaving the Company. In the case of an acquisition, we will include necessary years of pay from your prior employer to obtain 60 months of pay.

Your pay includes your salary, any pretax payroll deductions, paid incentive earnings, *bonuses*, overtime and commissions, in addition to paid time away from work due to illness, vacation or holidays.

App. at 102 (emphasis added). The SPD further established for employees who "transferred to another Pillsbury location or affiliate that is not covered by this Plan . . . your pension benefit [will be] calculated . . . based on . . . your final average pay when you actually retire." Id.

The Plan contends the "Continuous Service" provisions of Section 3.5(b) introduced an ambiguity into the Plan by creating the possibility of a vanishing pension when an employee transferred to a non-adopting affiliate for an extended period of time prior to retirement. On one hand, the Plan contemplates employees who participate in the top hat plan will receive a pension benefit upon retirement. The Plan also provides that employees who transfer to affiliates, including affiliates who have not adopted the Pillsbury plans, will continue to accrue continuous service for the purpose of calculating their pension benefit. On the other hand, the Plan defines

-8-

final average compensation based on the continuous service years closest to retirement, which could be served with either an "Employer" or a non-adopting affiliate, while limiting the compensation used to calculate benefits to compensation paid by an "Employer." As the Plan contends, this creates the absurd potential for a disappearing pension, because a participant's continuous service for a non-adopting affiliate could eliminate the pension he or she had before leaving Pillsbury.

We acknowledge the "Continuous Service" provisions of Section 3.5(b) create an ambiguity, which the Committee had discretion to resolve. We also acknowledge it was reasonable for the Committee to resolve this ambiguity so as to avoid the possibility of vanishing pensions, by including compensation paid by non-adopting affiliates when calculating final average compensation. The Plan contends, however, when computing the pension benefits in such situations, the Plan's grant of discretion allowed the use of a different definition of compensation than the one provided for in the Plan. We disagree.

We believe the ambiguity in the Plan about *whether* compensation from a non-adopting affiliate should be considered did not render the definition of compensation itself ambiguous. In other words, once the Plan resolved *whether* a given year's compensation would count, its exercise of discretion was complete. We are unaware of any contract principles under which the resolution of one ambiguity in a contract permits a party to adopt an entirely different meaning for other parts of the contract that are otherwise unambiguous. Cf. Verlo v. Equitable Life Assurance Soc'y of United States, 562 F.2d 1034, 1036 (8th Cir. 1977) ("[W]e will not read an ambiguity into an otherwise unambiguous document in order to be able to alter or vary its terms.").

The Ninth Circuit's decision in Scribner is instructive on this point. Like this case, Scribner involved the interpretation of a contract which gave one party discretion to interpret its terms, specifically, a stock option plan between an employer and

-9-

employee.  249 F.3d at 905. When Worldcom sold one of its divisions to another company, it promised the purchaser it would terminate Scribner and other key employees who ran the division so the purchaser could offer them jobs.  The issue was whether Scribner's termination under these circumstances was "with cause" or "without cause" for stock options purposes.  Id.  The word "cause" was not defined in the stock option plan.  Worldcom contended the broad interpretive discretion given to the plan's administrator gave Worldcom the right to define "cause" in a way that included terminations made in conjunction with the sale of a division.  Scribner claimed Worldcom was required to give the word "cause" its ordinary meaning, i.e., he was terminated as a result of inadequacy of performance or some shortcoming on his part.  Id. at 906-07.

The Ninth Circuit concluded the discretion granted in the plan did not give Worldcom the right to define "cause" however it chose:

> [T]he term "cause" is ordinarily a performance-related concept.  Unless WorldCom can point to something in the Plan, the contracts, or the context in which they were drafted that would define "cause" otherwise, we must give the word its ordinary meaning.  We cannot allow one party's "double-secret" interpretation of a word to undermine the other party's justified expectations as to what that word means.
>
> ...
>
> We therefore conclude that the discretion retained by the Committee was the discretion to determine whether Scribner had in fact been terminated for deficient performance.  The Committee did not retain the power to redefine the term "cause" in a way that would undermine Scribner's justified expectations as to what that word meant.  Although the Committee had broad discretion to interpret the contract, it did not have the authority to redefine its terms.  The contract and the context in which it was drafted indicate that "cause" can only mean termination for performance-related reasons.  The discretion retained by the Committee allowed it to determine, as a factual matter, whether Scribner had been

-10-

terminated for performance-related reasons, but did not authorize it to change the ordinary meaning of words after the fact and without notice.

Id. at 908, 911 (internal citation omitted).

Similarly, here, the Plan did not retain the discretion to change the meaning of the word "Compensation." The term was already specifically defined in the Plan and the SPD. The discretion retained by the Plan was the discretion to determine *whether* "Compensation" from a non-adopting affiliate would be included in the calculation of pension benefits. The Plan did not have discretion to redefine "Compensation" in a way that would undermine Craig's justified expectations – based on the Plan and the SPD – as to what that word meant. The Plan could not give "Compensation" a "double-secret" meaning after the fact and without notice. Because bonuses are considered "Compensation," the Plan was required to include the two retention bonuses Craig received in 2001 in the calculation of his pension benefits.

III

For the reasons stated, we affirm the judgment of the district court.

_____