# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2246

_____

| | |
|---|---|
| Roger Waldner, | * |
| | * |
|     Appellant, | * |
| | * |
| | *   Appeal from the United States |
|     v. | *   District Court for the Northern |
| | *   District of Iowa |
| Janet Wissel Carr; Dubuque Bank & | * |
| Trust Company, as Trustee of the | * |
| Marian Haas Kraus Trust; Marian Haas | * |
| Kraus, as Trustee of the Marie C. Haas | * |
| Trust, On behalf of John Chandler | * |
| Kraus; John C. Kraus; Carol Wissel | * |
| Lammers, Individually and as Trustee | * |
| of the Cyril H. Wissel Trust; Mary | * |
| Lois Wissel Piekenbrock; William A. | * |
| Piekenbrock; Elizabeth Kraus Tobin; | * |
| Patrick Tobin; Mary E. Wissel; Lois | * |
| Wissel Piekenbrock, as Trustee of the | * |
| Cyril H. Wissel Trust; Urban R. Haas, | * |
| Individually and as Trustee of the | * |
| Marie C. Haas Trust, On behalf of | * |
| Urban Andrew Haas, On behalf of | * |
| Christopher James Haas, On behalf of | * |
| Aimee Marie Haas, On behalf of | * |
| Catherine Antoine Haas; Patricia M. | * |
| Haas, Individually and as Trustee of the | * |
| Marie C. Haas Trust, On behalf of | * |
| Urban Andrew Haas, On behalf of | * |
| Christopher James Haas, On behalf of | * |
| Aimee Marie Haas, On behalf of | * |
| Catherine Antoine Haas; Marian Haas, | * |
| as Trustee of Marie C. Haas Trust, On | * |

behalf of John Chandler Kraus; Van      *
Wyk, Inc.; Arlan Van Wyk; David         *
Van Wyk; Darla Arends, formerly         *
known as Darla Van Wyk; Richard P.      *
Funke, as Executor of the Estate of     *
Mary E. Wissel for Mary E. Wissel,      *
                                        *
        Appellees.                      *

_____

Submitted: April 15, 2010
Filed: August 25, 2010
_____

Before WOLLMAN, MURPHY, and SHEPHERD, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

This case arises from failed negotiations for the acquisition and management of H&W Motor Express, Inc. ("H&W"), a financially struggling trucking company in Dubuque, Iowa. Roger Waldner appeals the district court's[1] adverse grant of summary judgment on his various state law tort and contract claims against three sets of defendants: (1) Urban Haas and Patricia M. Haas (collectively the "Haas defendants"); (2) shareholders of H&W, a group including the Haas defendants and others (collectively the "HWK defendants"); and (3) Van Wyk, Inc., a family-owned trucking company, and the company's owners (collectively the "Van Wyk defendants"). For the following reasons, we affirm.

---

[1]The Honorable Edward J. McManus, United States District Judge for the Northern District of Iowa.

I.

We view the facts in the light most favorable to Waldner, the nonmoving party. See R.D. Offutt Co. v. Lexington Ins. Co., 494 F.3d 668, 672 (8th Cir. 2007). The events giving rise to this factually complex case began when Waldner, after working in the trucking industry for approximately ten years, developed a plan to resurrect several trucking companies with financial difficulties. He predicted that, by consolidating the struggling trucking companies into one regional union cartage[2] company, the new union company would receive preferential treatment under a master agreement with the freight division of the International Brotherhood of Teamsters, and benefit financially from new customer revenue.

During the developmental stages of his business venture, Waldner, seeking a partnership, contacted the Van Wyk defendants and inquired if they would provide the financing—approximately $3 million—towards his purchase of the various trucking companies. After Waldner explained his plan to the Van Wyk defendants, ArlanVan Wyk, the chairman of Van Wyk, Inc., stated "get it done." No agreement was ever reduced to writing between the Van Wyk defendants and Waldner. However, the Van Wyk defendants formed Equity Holdings, Inc., a holding company for the stock of the trucking companies acquired by Waldner, opened and funded a checking account for Equity Holdings,[3] and agreed to an ownership interest in Equity Holdings which was equal to that of Waldner's. No Equity Holdings stock was ever issued to the Van Wyk defendants.

---

[2]"A cartage carrier is a less than full load trucking business ['LTL'] meaning that the cartage company delivers LTL freight to customers in geographical areas, usually from a central terminal, where the freight is offloaded by a coast to coast trucking firm." (Van Wyk Appellees' Br. 3 n.1.)

[3]The Van Wyk defendants provided a total of $1,170,703.88 to Equity Holdings.

One of the trucking companies that Waldner expressed an interest in acquiring was H&W. In December 2000, Waldner approached the HWK defendants to discuss the potential sale of H&W. Over the next few weeks, Waldner and the HWK defendants negotiated the proposed transaction whereby, in exchange for Waldner's assumption of H&W's corporate debt, he would acquire all H&W stock. During these negotiations, Waldner became aware of H&W's potential withdrawal liability to the Central States, Southeast and Southwest Areas Pension Fund ("Central States"), a multiemployer pension plan governed by the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), see 29 U.S.C. §§ 1301-1405.[4] Despite his knowledge of H&W's underfunded pension plan and the fact that he would inherit this liability once he took control of H&W, Waldner continued negotiations for the purchase of H&W. On January 9, 2001, Waldner entered into three agreements relevant to this appeal.

---

[4]The MPPAA is a statutory amendment to the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461. Specifically,

> The MPPAA establishes withdrawal liability for employers that cease participation in a multiemployer pension plan, as well as means for computing that liability. Complete withdrawal from a multiemployer pension plan occurs when an employer either permanently ceases to have an obligation to contribute under the plan or permanently ceases all operations covered under the plan. . . . At the time that an employer withdraws from a plan, the plan is required by the MPPAA to determine the amount of the employer's withdrawal liability, and notify the employer of that amount.

Seaway Port Auth. v. Duluth-Superior ILA Marine Ass'n. Restated Pension Plan, 920 F.2d 503, 505-06 (8th Cir. 1990) (quotation omitted).

1.    The HWK defendants and Waldner signed a document dated January 4, 2001,[5] and titled Memorandum of Understanding ("HWK Memorandum"), which consisted of a two-page outline for the multi-million-dollar transaction whereby Waldner would acquire H&W.  Relevant to this appeal, the HWK Memorandum indicated that: (1) Waldner would manage H&W; (2) Waldner would indemnify the HWK defendants from any unfunded pension liability; (3) the HWK defendants would transfer their stock in the Riverside Tractor-Trailer Company[6] ("Riverside stock") to H&W; (4) after a Stock Purchase Agreement was approved,[7] the HWK defendants would transfer their H&W stock to Waldner in exchange for a net-profit distribution; and (5) the HWK defendants would commit to pay approximately $2.2 million of operating capital which would be used to pay H&W's past debts.  Most notably, paragraph ten of the document specifically stated: "This Memorandum of Understanding is *clearly not the final and definitive agreement* amongst the parties to this agreement.  The parties *realize and acknowledge that a final and determinative Stock Purchase Agreement will be drafted once all of the details of the transaction can be agreed upon*."  (J.A. vol. I, 201 (emphasis added).)

2.    The Haas defendants and Waldner entered into a Stock Purchase Agreement regarding 121,750 shares of Riverside stock ("Riverside Purchase Agreement").  In the agreement, Waldner personally guaranteed to pay approximately $265,000 plus additional costs for H&W's purchase of Riverside stock from the Haas defendants ("the purchase price").  Waldner signed the agreement "In good faith for H&W."  (Id. at 85.)  The HWK defendants were not a party to this agreement.

---

[5]Although dated January 4, 2001, it is undisputed that the document was not signed until January 9, 2001.

[6]Riverside Tractor Trailer is a Dubuque, Iowa, trucking company, in which H&W owned a controlling interest.

[7]The Stock Purchase Agreement was to be approved by January 30, 2001.

3.    After signing the Riverside Purchase Agreement, the Haas defendants and Waldner signed a document dated January 9, 2001, and titled Memorandum of Understanding ("Haas Memorandum"). This document discussed the transfer of Riverside stock from the Haas defendants to H&W, and stated that the Haas defendants "*will agree* to give free and clear to H&W . . . 121,750 shares of Riverside [stock]" and listed only the book value of the stock, not the purchase price. (Id. at 204 (emphasis added).) The Haas Memorandum also explicitly stated that the Haas defendants would not participate in either the five-year profit sharing scheme or the $2.2 million reimbursement scheme that had been set up between Waldner and the HWK defendants in the HWK Memorandum. The HWK defendants were not a party to the Haas Memorandum.

After signing these documents, Waldner began managing H&W. The HWK defendants transferred their shares in H&W to Waldner, who issued new stock certificates in his name. The HWK defendants also transferred their Riverside stock to H&W. Waldner then transferred all of the H&W stock to Equity Holdings. Waldner also appointed a new board, became CEO of H&W, and assumed control of H&W's financial operations.

Waldner's business plan soon began to unravel. Although the HWK defendants had previously transferred their shares of H&W and Riverside stock, a finalized Stock Purchase Agreement between the parties was never approved. Eventually, the HWK defendants demanded the return of their H&W and Riverside stock. Additionally, the Haas defendants never transferred their Riverside stock to Waldner, as stipulated in the Haas Memorandum and the Riverside Purchase Agreement. Moreover, the Van Wyk defendants, who had already contributed approximately $800,000 towards the purchase of H&W,[8] abandoned the business venture. The Van Wyk defendants

_____

[8]Specifically, the Van Wyk defendants paid an outstanding debt owed by H&W in the amount of approximately $150,000, and transferred an additional $650,000 to

withdrew all funds they had previously contributed and refused to provide any additional funds because Waldner never obtained an enforceable contract with H&W. Finally, along with other trucking companies involved in the venture, H&W failed. Waldner authorized H&W to file for bankruptcy in June 2002, after he had transferred approximately $1.8 million worth of H&W assets to several corporations "with which he had a close relationship," including Equity Holdings.[9]  United States v. Waldner, 580 F.3d 699, 701 (8th Cir. 2009).

On June 26, 2003, Central States filed suit against The One Stop, Inc., one of several other corporations owned and controlled by Waldner.  Central States claimed that the company was liable for H&W's unfunded pension liability.[10]  Waldner then filed suit against the HWK defendants, the Haas defendants, and the Van Wyk defendants.  With regard to the HWK defendants, Waldner sought a declaratory judgment that the HWK Memorandum was a valid, binding, and enforceable contract, and alleging: (1) civil conspiracy, (2) fraudulent nondisclosure, (3) fraudulent misrepresentation, (4) unjust enrichment, (5) promissory estoppel, (6) breach of

---

Equity Holdings for the eventual purchase of H&W.

[9]After the bankruptcy filing, Waldner pled guilty to two counts of knowingly and fraudulently making false statements under penalty of perjury, in violation of 18 U.S.C. § 152(3).  We upheld a 120-month sentence and restitution order in the amount of $1,722,717.61 imposed on Waldner for these convictions.  See United States v. Waldner, 580 F.3d 699, 703, 709 (8th Cir. 2009).

[10]The complaint alleged: "One Stop and H&W were a group of trades or businesses under common control [(the 'group')] and therefore constituted a single employer [under ERISA]."  (J.A. vol. III, 742.)  The complaint further stated that this group "ceased to have an obligation to contribute to the [Central States] Pension Fund," which resulted in a withdrawal liability to Central States.  (Id.)  Moreover, the complaint noted that the group had "failed to make any withdrawal liability payments to the Pension Fund and fell into default withing the meaning of [ERISA]" and that "One Stop, as a member of [the controlled group], is jointly and severally liable to the Pension Fund for the withdrawal liability."  (Id. at 743.)

contract as to the HWK Memorandum, and (7) rescission of the HWK Memorandum. As to the Haas defendants, Waldner brought two claims: (1) breach of contract as to the Haas Memorandum, and (2) rescission of the Haas Memorandum. Waldner also brought a breach of contract claim against the Van Wyk defendants, alleging that they had breached their oral agreement to finance Waldner's acquisition of the trucking companies.

The HWK defendants and the Haas defendants jointly moved for summary judgment against Waldner.[11] On March 21, 2007, the district court granted the motion, noting that: (1) the nondisclosure and fraudulent misrepresentation claims failed based on a lack of any justifiable reliance by Waldner; (2) the civil conspiracy claim failed because it relied on the nondisclosure and fraudulent misrepresentation claims; (3) the HWK Memorandum was not a valid contract and therefore the plaintiff's claims for rescission, breach of contract, and a declaratory judgment failed; (4) it was not unjust for Waldner to be subject to the withdrawal liability in light of the HWK defendants' demand for return of their stock and Waldner's unsupported refusal of such demand; (5) as to Waldner's promissory estoppel claim, no clear and definite agreement existed for him to reasonably rely on; and (6) Waldner's claim for breach of contract and rescission of the Haas Memorandum failed because the Haas Memorandum was not a valid contract.

On June 11, 2007, the Van Wyk defendants moved for summary judgment on the breach of contract claim. The district court granted the motion stating,

> while it appears that there existed a concept and potential business venture upon which the parties took substantial actions based on hope or anticipation, there has not been an offering of sufficient evidence of

---

[11]Although Janet Wissel Carr did not join in the original motion for summary judgment by the HWK defendants, she joined prior to the district court's final ruling.

terms to ascertain the duties, conditions relative to performance and obligations of each party in this complex undertaking to acquire multiple companies in the furtherance of the venture, so as to generate a disputed issue of material fact sufficient to withstand summary judgment.

(J.A. vol. II, 341-42.) Waldner now appeals.

## II.

We review the district court's grant of summary judgment de novo. Reynolds v. RhabCare Group E., Inc., 591 F.3d 1030, 1032 (8th Cir. 2010). Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the [movant] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). As this is an action based on diversity of citizenship, all issues of substantive law are governed by Iowa state law. See Melvin v. Car-Freshener Corp., 453 F.3d 1000, 1002 (8th Cir. 2006).

## A.

We first address the district court's grant of summary judgment to the HWK defendants. We note that the parties do not dispute the district court's analysis of all related claims together, and we do the same.

### 1. Rescission, Breach of Contract, and Declaratory Judgment

Waldner sought a declaratory judgment that the HWK Memorandum was a valid, binding, and enforceable contract, and alleges that the HWK defendants breached this contract by (1) demanding the return of their stock and (2) failing to contribute any operating capital to H&W. Waldner also argues that, because of the HWK defendants' breach, the contract should now be rescinded and all stock, as well as any withdrawal liability to Central States, should return to the HWK defendants. We are unconvinced by Waldner's interpretation of basic contract principles and agree

with the HWK defendants' argument that the HWK Memorandum was merely an agreement to agree, and not a contract that could be breached or rescinded.

Under Iowa law, a court will not enforce a contract unless it is "definite and certain as to its terms to enable the court to give it an exact meaning." Palmer v. Albert, 310 N.W.2d 169, 172 (Iowa 1981) (quotation omitted); see also Air Host Cedar Rapids, Inc. v. Cedar Rapids Airport Comm'n, 464 N.W.2d 450, 453 (Iowa 1990) ("It is axiomatic that understandable or ascertainable terms are necessary ingredients for an enforceable contract."). Although Iowa courts are hesitant to "hold a contract unenforceable for uncertainty and they bend every effort to avoid such a result," Palmer, 310 N.W.2d at 172, courts cannot create a contract when one does not already exist, see Gould v. Gunn, 140 N.W. 380, 384 (Iowa 1913) ("[N]either the court nor the jury can make a contract for the parties, although it may resort to many rules to ascertain their intent when they go so far as to attempt the creation of some form of obligation."). Because "[a] contract generally is not found to exist where the parties agree to a contract on [a] basis to be settled in the future," Air Host, 464 N.W.2d at 453, and because the HWK Memorandum unambiguously states that it is "clearly not the final and definitive agreement" and that "a final and definitive . . . Agreement will be drafted once all of the details of the transaction can be agreed upon," (J.A. vol. I, 201), the document was merely "a contract on [a] basis to be settled in the future," hence, unenforceable. Air Host, 464 N.W.2d at 453.

Waldner contends that various actions taken by the HWK defendants, which conformed to the language of the HWK Memorandum, establish that the HWK defendants also believed a valid contract existed. Specifically, he argues, "Promptly after the [HWK Memorandum] was signed by the parties, the [HWK defendants] transferred their ownership of H&W to Waldner as well as their [Riverside] stock," (Appellant's Br. 41-42), thus acting as if a valid contract was in place. However, "[s]uch evidence of the parties is admissible to interpret but not to vary the agreement." Air Host, 464 N.W.2d at 453. Although many terms of the agreement

-10-

were outlined in the HWK Memorandum and the parties began preparing for the execution of a final contract, the document clearly and unambiguously expressed that it was not the final agreement. We conclude that the HWK Memorandum was merely an agreement to agree in the future and did not constitute a valid contract because the necessary Stock Purchase Agreement was never signed by the parties. Therefore, Waldner's declaratory judgment and breach of contract claims fail.

Furthermore, because we have determined that no valid and binding contract existed, Waldner's claim for rescission also fails. Although it is true that "[p]arties to a valid contract may rescind or abandon it, or substitute another in its place," State v. Woldford Corp., 689 N.W.2d 471, 476 (Iowa 2004) (quotation omitted), the law demands that a *valid* contract first exist. See id. Because the parties did not have a valid contract, there was nothing to rescind. Therefore, the district court did not err in granting summary judgment to the HWK defendants on Waldner's rescission claim.

2. Civil Conspiracy, Fraudulent Misrepresentation, and Fraudulent Nondisclosure

In his complaint, Waldner alleges that the HWK defendants conspired to transfer management of H&W to Waldner for the purpose of escaping the withdrawal liability to Central States. He claims that the HWK defendants falsely represented that they would (1) transfer their H&W stock to Waldner and (2) transfer their Riverside stock and $2.2 million in operating capital to H&W. Waldner claims that the HWK defendants also failed to disclose that his acquisition of H&W would subject "any corporations [Waldner] owned under common control with H&W" to the withdrawal liability. (Appellant's Br. 30.) In his opening brief, Waldner only challenges the district court's finding that he did not justifiably rely on the HWK defendants' allegedly false promises for his fraudulent misrepresentation claim, and as such, we need not address the issues of civil conspiracy and fraudulent nondisclosure. See K.D. v. County of Crow Wing, 434 F.3d 1051, 1055 n.4 (8th Cir. 2006) (failure to raise issue in opening brief results in waiver).

-11-

Among other elements, to establish a claim for fraudulent misrepresentation, a plaintiff must establish that he justifiably relied on an intentionally false statement by the defendant. See Gibson v. ITT Hartford Ins. Co., 621 N.W.2d 388, 400 (Iowa 2001).[12] "The justifiable-reliance standard does not mean a plaintiff can blindly rely on a representation." Spreitzer v. Hawkeye State Bank, 779 N.W.2d 726, 737 (Iowa 2009). Instead, a plaintiff must "observe the obvious, and the [court must consider the] entire context of the transaction." Id. The reliance must be deemed justified, and not simply reasonable in nature, see Lockard v. Carson, 287 N.W.2d 871, 878 (Iowa 1980), therefore "the reliance does not necessarily need to conform to the standard of a reasonably prudent person, but depends on the qualities and characteristics of the particular plaintiff and the specific surrounding circumstances," Spreitzer, 779 N.W.2d at 737.

In determining whether justifiable reliance exists, Iowa courts have compared their common-law fraud claims to federal securities fraud claims, and have noted that the following factors utilized by federal courts are helpful to Iowa courts for guidance:

---

[12]The elements of fraudulent misrepresentation include:

(1) defendant made a representation to the plaintiff, (2) the representation was false, (3) the representation was material,(4) the defendant knew the representation was false, (5) the defendant intended to deceive the plaintiff, (6) the plaintiff acted in reliance on the truth of the representation and was justified in relying on the representation, (7) the representation was a proximate cause of plaintiff's damages, and (8) the amount of damages.

Gibson v. ITT Hartford Ins. Co., 621 N.W.2d 388, 400 (Iowa 2001).

(1) the sophistication and expertise of the plaintiff in financial . . . matters; (2) the existence of long-standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the . . . transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

Id. (quoting Davidson v. Wilson, 973 F.2d 1391, 1400 (8th Cir. 1992). Here, because the HWK Memorandum explicitly stated that it was not the final contract, Waldner could not have justifiably relied on its contents. Waldner, who had been involved in the trucking business for ten years, had basic familiarity with such contracts and should have realized that more details were needed to finalize the agreement. Waldner also should have read the plain language of the HWK Memorandum to indicate that a final agreement was to take place in the future. Therefore, we find no error in the district court's grant of summary judgment to the HWK defendants as to Waldner's conspiracy, fraudulent misrepresentation, and fraudulent nondisclosure claims.

### 3. Unjust Enrichment

Waldner alleges that the HWK defendants were unjustly enriched by his assumption of the Central States withdrawal liability when he acquired the H&W stock. The theory of unjust enrichment "is premised on the idea that it is unfair to allow a person to benefit from another's services when the other expected compensation." State Pub. Defender v. Iowa Dist. Court for Woodbury County, 731 N.W.2d 680, 684 (Iowa 2007). Such implied contracts do not arise from the traditional bargaining setting but "rest on a legal fiction arising from considerations of justice and the equitable principles of unjust enrichment." Hunter v. Union State Bank, 505 N.W.2d 172, 177 (Iowa 1993).

Iowa courts discuss three elements in analyzing a claim for unjust enrichment: (1) whether the recipient was enriched by the receipt of the benefit; (2) if the enrichment was at the expense of the provider; and (3) whether it is unjust to allow the recipient to retain the benefit under the circumstances. See State ex rel. Palmer v. Unisys Corp., 637 N.W.2d 142, 154-55 (Iowa 2001). The district court did not discuss the first two elements of unjust enrichment and found that, because Waldner had refused to return the HWK defendants' stock, therefore maintaining management of H&W, it was not unjust for Waldner to remain liable for the withdrawal liability. We agree. Because Waldner had willingly placed himself in this position by denying the return of the HWK defendants' stock—in other words, refusing to surrender management of H&W—we conclude that Waldner cannot now, when H&W is bankrupt, attempt to return the stock. We hold that Waldner should remain liable for the withdrawal liability and that the district court was correct in granting the HWK defendants' motion for summary judgment as to Waldner's claim of unjust enrichment.

## 4. Promissory Estoppel

Waldner also brings a claim of promissory estoppel based upon his reliance on the HWK defendants' promises in the HWK Memorandum. One of the elements of promissory estoppel is "a clear and definite promise." Schoff v. Combined Ins. Co. of Am., 604 N.W.2d 43, 49 (Iowa 1999). Here, there was no such clear and definite promise, as many specific terms and duties were absent from the agreement. As noted in our discussion of the breach of contract claim above, the agreement explicitly indicated that it was "clearly not the final and definitive agreement amongst the parties." (J.A. vol. 1, 201.) We therefore affirm the district court's dismissal on summary judgment of Waldner's promissory estoppel claim.

-14-

B.

We next address Waldner's breach of contract and recision claims against the Haas defendants. In his complaint, Waldner alleged that the Haas defendants breached the contract formed by the Haas Memorandum by failing to transfer their Riverside stock to H&W, which in turn led to H&W's inability to secure operating funds, and its eventual demise. Waldner also claims that this breach entitles him to rescind the alleged contract and return to the Haas defendants the H&W shares they had transferred to Waldner, which would also transfer any Central States withdrawal liability back to the Haas defendants.

To establish a breach of contract claim, Waldner must prove the following: "(1) the existence of a contract, (2) the terms and conditions of the contract, (3) that [he] has performed all of the terms and conditions required under the contract, (4) [the Haas defendants] breach[ed] the contract in some particular way, and (5) [Waldner] has suffered damages as a result of the breach." Iowa-Illinois Gas & Elec. Co. v. Black & Veatch, 497 N.W.2d 821, 825 (Iowa 1993). Here, Waldner is unable to meet his burden. The language of the Haas Memorandum notes that the Haas defendants "will agree" to transfer the stock, supporting the conclusion that a completed contract does not exist. Furthermore, the Riverside Purchase Agreement signed by Waldner and the Haas defendants explicitly stated that Waldner would pay $265,000 in exchange for the Riverside shares. The fact that the Haas Memorandum discusses the same Riverside shares, yet does not mention the purchase price, supports the conclusion that the Haas Memorandum was, in fact, not the final contract, but was dependant on the Riverside Purchase Agreement. Moreover, because Waldner never paid the purchase price, he can not establish that he performed all the terms and

conditions required under the contract and thus, Waldner's breach of contract claim fails.  See id.[13]

Because the Haas Memorandum was not a valid contract, it could not be rescinded.  See Woldford Corp., 689 N.W.2d at 476.  Therefore, we affirm the district court's grant of summary judgment to the Haas defendants on Waldner's breach of contract and rescission claims.

C.

Waldner finally argues that the district court erred in granting summary judgment to the Van Wyk defendants on his breach of contract claim, alleging that the Van Wyk defendants breached their oral contract with Waldner by (1) withdrawing their previously contributed funds and (2) refusing to provide any additional financial aid towards Waldner's acquisition of the trucking companies.  In support of his argument, Waldner contends that he and the Van Wyk defendants formed a valid oral contract whereby the Van Wyk defendants agreed to provide $3 million to finance Waldner's acquisitions of the trucking companies, in exchange for an equity interest in Equity Holdings.  In opposition, the Van Wyk defendants claim that no contract existed, because the Van Wyk defendants and Waldner only discussed Waldner's "vision," which lacked specific and definite terms as required by Iowa law to find the existence of a valid contract.

Generally, the existence of a valid oral contract is a question of fact; however, judgment as a matter of law is appropriate if a party has not offered sufficient evidence to support the existence of a contract.  See Gallagher, Langlas & Gallagher

---

[13]Finally, we note that the district court's holding, that the Haas Memorandum was conditioned on the HWK Memorandum, remains undisputed.  That the Haas Memorandum was dependant upon an invalid contract is further evidence that the Haas Memorandum itself is unenforceable.

v. Burco, 587 N.W.2d 615, 617 (Iowa Ct. App. 1998); see also Faught v. Budlong, 540 N.W.2d 33, 40 (Iowa 1995) (determining that the length of negotiations, complexity of issues, amount of money involved, number of proposal and counter proposals, and general distrust amongst the parties indicated that no reasonable person would find that an oral contract existed). Sufficient evidence of an oral contract exists when the parties can ascertain the duties and conditions of the contract terms. See Gallagher, 587 N.W.2d at 617 (the terms of the agreement must be sufficiently definite for "a court to determine with certainty the duties of each party, the conditions relative to performance, and a reasonably certain basis for a remedy"). In sum, "for an oral contract to be . . . enforceable, the terms must be so definitely fixed so that nothing remained except to reduce the terms to writing." In re Guardianship & Conservatorship of Price, 571 N.W.2d 214, 216 (Iowa Ct. App. 1997).

Iowa courts have cited with approval section 27 of the Restatement (Second) of Contracts, which notes several factors to be considered in determining whether or not a contract's terms are sufficiently definite. See Faught, 540 N.W.2d at 36 (citing Restatement (Second) of Contracts § 27 (1981)). Specifically, the Restatement notes:

> Among the circumstances which may be helpful in determining whether a contract has been concluded are the following: the extent to which express agreement has been reached on all the terms to be included, whether the contract is of a type usually put in writing, whether it needs a formal writing for its full expression, whether it has few or many details, whether the amount involved is large or small, whether it is a common or unusual contract, whether a standard form of contract is widely used in similar transactions, and whether either party takes any action in preparation for performance during the negotiations. Such circumstances may be shown by oral testimony or by correspondence or other preliminary or partially complete writings.

Restatement (Second) of Contracts § 27 cmt. c.

The record here is devoid of any indication that the alleged oral contract between the Van Wyk defendants and Waldner established the duties and conditions of a valid oral contract. Specifically, no express agreement was reached as to all the terms of the contract because (1) the communications between the Van Wyk defendants and Waldner did not contain many details of the respective duties and conditions, (2) this was an elaborate business plan, (3) the plan involved multiple potential acquisitions, and (4) the venture required a large sum of money. See Restatement (Second) of Contracts § 27 cmt. c.

By contrast, in Severson v. Elberon Elevator, Inc., 250 N.W.2d 417 (Iowa 1977), the Iowa Supreme Court held that the terms of an oral contract existed with reasonable certainty where the following details had been established with regards to the sale of a railroad: (1) a contract price, (2) the date of possession, (3) the insurance coverage, (4) the property taxes responsibilities, (5) the transfer of marketable title, and (5) the duties of the parties. See id. at 420. The court noted "[w]e think the terms were sufficiently complete and specific when given those reasonable interpretations that ordinary businessmen are willing to give and considering the surrounding circumstances." Id. at 421 (citation omitted). Severson further expressed,

> We agree that prudent businessmen might well have acted more wisely than the parties to this transaction. Indeed, this litigation could have been avoided if they had entered [into] the kind of written contract defendant now asserts was then contemplated. However, our decision must be based on what the parties did in fact, not on whether they acted prudently.

Id. at 420. Unlike Severson, where the defendant was "intimately familiar" with his duties under the agreement, and the terms were "sufficiently complete and specific when given those reasonable interpretations that ordinary businessmen are willing to give and considering the surrounding circumstances," see id. at 421, here, we are without such explicit contract terms.

-18-

Moreover, even if the oral agreement contained terms that were sufficiently complete, the parties clearly anticipated further negotiations prior to finalizing the contract. Although Iowa law permits the enforcement of oral contracts, as with all contracts, "an agreement to agree is not a contract." Whalen v. Connelly, 545 N.W.2d 284, 293 (Iowa 1996); see Faught, 540 N.W.2d at 35-36 ("[T]he parties may intend that obligation should arise only upon the signing of a written instrument embodying the terms they have tentatively agreed to." (quotation omitted)). Waldner surmises that the existence of the valid contract between both parties is supported by various actions taken by the Van Wyk defendants, such as forming Equity Holdings, and paying approximately $800,000 towards acquiring H&W, all prior to the Van Wyk defendants' withdrawal of the funds. The Van Wyk defendants counter that Waldner's acquisition of H&W was a condition precedent to any financing they would provide, that any money they had already forwarded to Waldner and Equity Holdings was conditioned on this acquisition, and that they eventually chose to "opt out" of ever participating in Waldner's plan and did not breach a valid contract already in place. Although we do not doubt that the Van Wyk defendants did, in fact, contribute funds and begin preparations to fulfill Waldner's business plan, the fact remains that these were mere preparatory actions. We conclude that the Van Wyk defendants' actions were not "evidence of performance that would prove the formation of the contract," but were merely preliminary steps taken to assure that future agreement could be finalized. See Act, Inc. v. Sylvan Learning Sys., Inc., 296 F.3d 657, 665 (8th Cir. 2002) (applying Iowa law).

In sum, we agree with the conclusion of the district court that "while it appears there existed a concept and potential business venture upon which the parties took substantial actions based on hope or anticipation," these were merely preliminary negotiations with Waldner, the terms of which were not definite enough to constitute a valid oral contract. (J.A. vol. II, 341-42.) We therefore affirm the district court's grant of summary judgment to the Van Wyk defendants on Waldner's breach of contract claim.

## III.

Accordingly, we affirm the district court's grant of summary judgment dismissing all of Waldner's claims.

_____