# United States Court of Appeals
## For the Eighth Circuit
_____

No. 24-1555
_____

Barton Hankins

*Plaintiff - Appellee*

v.

Crain Automotive Holdings, LLC

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Eastern District of Arkansas - Central
_____

Submitted: January 16, 2025
Filed: February 28, 2025
_____

Before GRUENDER, BENTON, and ERICKSON, Circuit Judges.
_____

ERICKSON, Circuit Judge.

Crain Automotive Holdings, LLC ("Crain") is an automotive dealer headquartered in Arkansas. In 2019, it hired Barton Hankins in an executive role and offered him a deferred compensation plan. Four years later, Hankins resigned and sought compensation under the plan. After Crain denied his claim, Hankins brought this action pursuant to the Employee Income Retirement Security Act of

1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). The district court[1] granted judgment on the administrative record in Hankins's favor and awarded him attorney's fees. Crain appeals both decisions. We affirm.

## I.    BACKGROUND

When Crain hired Hankins as its Chief Operating Officer in 2019, it offered him a deferred compensation plan ("DCP"). These plans, sometimes called "top hat" plans, delay compensation for high-earning employees. Craig v. Pillsbury Non-Qualified Pension Plan, 458 F.3d 748, 749 (8th Cir. 2006). Under the terms of Crain's DCP, Hankins could earn five percent of Crain's fair market value upon his exit from the company. His payout was dependent on the number of years at the company, with full vesting occurring at five years. Hankins stayed for four years, from January 2019 to January 2023, which under the DCP resulted in a nonforfeitable percentage of 80%.

When he resigned, Hankins sought his vested compensation. His resignation was a triggering event under the DCP and commenced a process set out in the DCP and required by ERISA. Midgett v. Washington Grp. Int'l Long Term Disability Plan, 561 F.3d 887, 893 (8th Cir. 2009) (explaining that "29 C.F.R. § 2560.503–1 sets forth minimum requirements for employee benefit plan procedures pertaining to claims for benefits" (cleaned up)). The first step required Crain to make an initial determination of benefits. If Hankins disagreed with Crain's determination, he could file a written claim for benefits. If Crain denied the written claim, Hankins had the right to appeal—and if his appeal was denied, having exhausted his administrative remedies, Hankins could file an action in federal court.

The parties followed the claims process. Crain refused to pay Hankins before the DCP's payment deadline, which the parties agreed to treat as an initial

_____

[1]The Honorable Brian S. Miller, United States District Judge for the Eastern District of Arkansas.

determination of Hankins's claim. Hankins responded with a written claim for benefits. Crain denied the claim, explaining that Hankins never signed two important agreements with Crain. It pointed to Article 4 in the DCP, which provides:

> Notwithstanding anything in Article 5 to the contrary, the rights of Employee, or, if deceased, his beneficiary, to receive payments under this Plan or any unpaid installments shall immediately cease if Employee breaches the covenants set forth in the Employment Agreement and Confidentiality, Noncompete, and Nonsolicitation Agreement agreed to by the Employer and Employee. In addition, the termination of Employee by the Employer for Cause shall exclude Employee from receipt of any benefits under this Plan.

The parties acknowledged they never executed an Employment Agreement or a Confidentiality, Noncompete, and Nonsolicitation Agreement ("Confidentiality Agreement"). Crain concluded that because these agreements did not exist when Hankins began performing under the DCP, it was Hankins's responsibility to create the agreements. Without the agreements, Crain asserted, it could not determine whether Hankins had breached Article 4. Without being able to resolve the question of breach, Crain claimed it could not make a benefits determination under the DCP.

Hankins appealed, asserting Article 4 did not require him to draft, propose, and sign the agreements at issue. Crain denied the appeal, restated its position with respect to Article 4, and asserted Hankins had engaged in misconduct by inflating Crain's assets and income. Hankins appealed again. When Crain did not respond, Hankins sued in federal court under one of ERISA's enforcement provisions. See 29 U.S.C. § 1132(a); Denzler v. Questech, Inc., 80 F.3d 97, 99 n.1 (4th Cir. 1996) (acknowledging that top hat plan beneficiaries may sue pursuant to § 1132(a)).

The district court concluded the DCP did not require the parties to create Employment and Confidentiality Agreements. The court found that the parties knew those agreements did not exist when they drafted the DCP, the DCP did not condition enforceability on their existence, and the parties operated under the DCP for four years. Because Crain never raised the issues related to the Employment Agreement

-3-

or the Confidentiality Agreement until after Hankins had sought compensation under the DCP, the district court found the facts supported a reasonable inference that Crain was "simply looking for a way to avoid its obligations." The district court found that Crain's claims of misconduct by Hankins were unsubstantiated.

Hankins then sought attorney's fees and costs pursuant to Rule 54(d) of the Federal Rules of Civil Procedure, Eastern District of Arkansas Local Rule 54.1, 28 U.S.C. § 1920, and 29 U.S.C. § 1132(g)(1). The district court granted his request, finding Hankins was the prevailing party, Crain had the means to pay, and Crain's conduct was sufficiently culpable. Crain now appeals both decisions. On appeal, Crain has abandoned its argument that Hankins committed misconduct but maintains its interpretations of Article 4 and the DCP were reasonable.

## II. DISCUSSION

### A. Benefits Determination

The district court granted judgment on the administrative record in favor of Hankins, a decision we review *de novo*. Menz v. Procter & Gamble Health Care Plan, 520 F.3d 865, 869 (8th Cir. 2008). Likewise, we review Crain's underlying benefits decision *de novo*. Craig, 458 F.3d at 752.

As a preliminary matter, Crain contends we must review its decision for abuse of discretion, or alternatively apply a form of "*de novo* with deference" review. We typically review plan administrators' decisions for abuse of discretion when they have interpretive discretion. See Craig, 458 F.3d at 752. But the policy considerations that trigger abuse of discretion review "are simply not present in the case of a top hat plan." Id. While the DCP grants Crain discretion to construe and interpret its terms, such "discretion must be exercised in good faith—a requirement that includes the duty to exercise the discretion reasonably." Id. (citation omitted). In effect, we review Crain's interpretations for reasonableness. An interpretation is not reasonable if it ignores qualifying language or contravenes "the plain language

-4-

of the plan documents." See Bender v. Xcel Energy, Inc., 507 F.3d 1161, 1170 (8th Cir. 2007) (reviewing a plan administrator's interpretation for reasonableness).

The DCP provides that the governing law shall be the "laws of Arkansas." We, however, apply federal common law because "parties may not contract to choose state law as the governing law of an ERISA-governed benefit plan." Prudential Ins. Co. of Am. v. Doe, 140 F.3d 785, 791 (8th Cir. 1998). Under the federal common law developed alongside ERISA, words are given their plain and ordinary meaning. Cent. States, Se. & Sw. Areas Pension Fund v. Indep. Fruit & Produce Co., 919 F.2d 1343, 1350 (8th Cir. 1990). We consider the entire contract to determine whether a term is ambiguous on its own or in context. See Sheet Metal Workers Int'l Ass'n, Loc. No. 3 v. Lozier Corp., 255 F.3d 549, 551 (8th Cir. 2001) (discussing collective bargaining agreements). While we read words in context, we may not rely on collateral sources when the contractual language is clear. See Excel Corp. v. United Food & Com. Workers Int'l Union, 102 F.3d 1464, 1468 (8th Cir. 1996) (interpreting a collective bargaining agreement).

The central thrust of Crain's position is that Hankins was required to sign both an Employment Agreement and Confidentiality Agreement before he could accept the DCP; however, top hat plans are unilateral contracts. Craig, 458 F.3d at 752. In a unilateral contract, "an offer is accepted by a performance." Conley v. Pitney Bowes, 34 F.3d 714, 717 (8th Cir. 1994). Hankins performed under the DCP by remaining Crain's employee, without being terminated for cause, until the occurrence of a "triggering event." The DCP also contemplated that the benefit could be forfeited in the event of a breach of two nonexistent agreements, the Employment Agreement and the Confidentiality Agreement. Crain believes that because the two agreements did not exist at the time Hankins began to perform under the DCP, the burden rested upon him to create the agreements if he was going to claim the benefit of the DCP.

Crain contends Article 4 is ambiguous with respect to the two agreements, and it reasonably resolved the ambiguities when it interpreted Article 4 as requiring

Hankins to create the two agreements. A term may be ambiguous on its face or in context with other terms in the contract. See Lozier Corp., 255 F.3d at 551. Article 4 provides that Hankins's rights under the DCP "immediately cease" if he "breaches the covenants set forth in the Employment Agreement and Confidentiality, Noncompete, and Nonsolicitation Agreement agreed to by the Employer and Employee." Contrary to Crain's assertions, this provision is facially unambiguous. It creates a clear conditional rule: if Hankins breaches either agreement, he loses his DCP benefits. The rule is valid even though neither agreement existed when Hankins concluded his obligations under the DCP. By its terms, it operated as a condition subsequent and would have required Hankins to abide by both agreements if they were ever created.

While Article 4 references the agreements as if they already exist, this does not introduce ambiguity. Contracts may refer to something that is non-existent without posing an interpretive problem. For example, some option contracts reference goods not yet produced. Myron v. Hauser, 673 F.2d 994, 997 (8th Cir. 1982). A contract may also contain a clause covering "events that may or may not happen." Stein v. Paradigm Mirasol, LLC, 586 F.3d 849, 858 (11th Cir. 2009) (discussing *force majeure* clauses). A similar principle applies here. Though the agreements did not exist when Hankins began performing under the DCP, the parties could have created them at any time. If those agreements were created, Hankins's DCP benefits would have become conditional on his compliance with them. Article 4's automatic trigger, "immediately cease," reinforces this reading, as it describes a consequence for a specific future event, not a requirement that the agreements exist.

Crain also contends the existence of the agreements could be read as conditions precedent. This approach is untenable for several reasons. First, nothing in Article 4 or elsewhere in the DCP requires Hankins to enter the agreements. Second, we cannot treat the agreements as conditions precedent without transforming Article 4 into an unenforceable "agreement to agree." See Waldner v. Carr, 618 F.3d 838, 851 (8th Cir. 2010) (explaining that "an agreement to agree is not a contract"). Crain could condition DCP benefits on compliance with specific

agreements, but it could not require Hankins to accept unknown future contract terms—nor does the text of Article 4 support that construction. Finally, that Crain proceeded under the DCP without the agreements is another reason to read them as conditions subsequent rather than conditions precedent.

Lastly, Crain contends it acted reasonably when it consulted extrinsic evidence to find an ambiguity in Article 4. In support of its claim, it points to evidence such as a memo construing the DCP and Hankins's attempts to negotiate an employment agreement. However, extrinsic evidence cannot create ambiguity in the face of a contract's plain language. We cannot explore Hankins's activity as an employee to create an ambiguity where none otherwise exists because "[w]hether an employee is entitled to benefits under ERISA is controlled by the plan documents and not the customs of a company." Pendleton v. QuikTrip Corp., 567 F.3d 988, 993 (8th Cir. 2009). Crain's interpretation of Article 4 was unreasonable. Judgment on the administrative record in Hankins's favor was appropriate.

## B.    Attorney's Fees

The district court awarded Hankins nearly $20,000 in attorney's fees and costs based on the factors set forth in Lawrence v. Westerhaus, 749 F.2d 494 (8th Cir. 1984). We review that decision for abuse of discretion. Nesse as Trs. of Minn. Laborers Health & Welfare Fund v. Green Nature-Cycle, LLC, 7 F.4th 769, 781 (8th Cir. 2021).

Crain contends the district court abused its discretion when it awarded attorney's fees because Crain had evidentiary support for its decision. A court may "allow a reasonable attorney's fee and costs of action to either party" in most ERISA enforcement actions brought by participants, beneficiaries, and fiduciaries. 29 U.S.C. § 1132(g)(1). Westerhaus guides a court's exercise of discretion under § 1132(g) by listing factors including "the degree of the opposing parties' culpability or bad faith" and "the relative merits of the parties' positions." 749 F.2d at 496. Crain raised the lack of Employment and Confidentiality Agreements only after

Hankins sought his vested compensation. It also hesitated to explain its decision denying Hankins benefits, then reached an unreasonable interpretation of Article 4 based upon extrinsic evidence. Under the circumstances, the district court did not abuse its discretion when it granted Hankins's motion for attorney's fees. See Cent. Valley Ag Coop. v. Leonard, 986 F.3d 1082, 1089 (8th Cir. 2021) (affirming an award of attorney's fees against a plan administrator whose claims "lacked merit from the beginning of the lawsuit").

## III.   CONCLUSION

We affirm the district court's judgments.

_____